**In the Matter of the ADOPTION OF ROBIN.**

**Laura OSBORNE, Appellant,**

v.

**Billie Jean KING and Jerry King, Appellees.**

**No. 49626.**

Supreme Court of Oklahoma.

Nov. 15, 1977.

Franklin Cal Hoover, Ada, Huser & Huser, Wewoka, for appellant.

Hubert Hargrave, Raymond Criswell, Wewoka, for appellees.

SIMMS, Justice:

This is an appeal by Laura Osborne, nee King, from the trial court's order denying her petition to vacate and set aside the decree of adoption which declared her natural daughter, Robin, to be the adopted child of Jerry and Billie King (appellees). Jerry King is Laura's natural father and Billie King, his wife, Laura's stepmother.

These facts are undisputed. In May of 1969, Laura, then sixteen years old, unmarried and in the last month of her pregnancy, moved into the King's home in Sasaska, Oklahoma. On June 16, 1969, she gave birth to Robin and after several days of hospitalization, she and the infant Robin returned to the King's home. One week after Robin's birth, on June 24, 1969, Billie King accompanied Laura to Wewoka, where Laura executed a consent to Robin's adoption by the Kings before District Judge Bob Howell. Laura remained in the King's home for about a month, when she married Edison Sealy. Appellee Jerry King gave his consent to the marriage because Laura was underage. She and Edison Sealy

moved away and Robin remained with the Kings.

In 1973 Laura and Edison Sealy were divorced. On January 26, 1973, the Kings filed a petition for Robin's adoption in the District Court of Seminole County. Attached to their petition was Laura's consent executed in June, 1969. On June 13, 1973, the court ordered the Department of Welfare to conduct a pre-adoptive investigation of Billie and Jerry King.

The social worker's report filed with the court on July 12, 1973, reflected that the whereabouts of Robin's mother were "unknown" and that the identity of Robin's father was "unknown". The social worker stated in the report that she had determined after investigation, that Robin was a "suitable and proper subject" for adoption and that Billie and Jerry King were suitable parents for Robin. She recommended to the court that the adoption be approved.

On August 16, 1973, the decree of adoption attacked here was issued by the court. The decree states that: "It appearing to the court that the father of Robin is unknown"; that the mother "has consented in writing properly acknowledged before a court of competent jurisdiction"; and the Department of Welfare having conducted its investigation and finding the petitioners, Billie and Jerry King, to be suitable persons to adopt Robin; that "from the evidence taken" the court found that the Kings were suitable persons to have the care and custody of Robin and decreed the adoption.

On May 28, 1974, Laura married Bobby Osborne. On June 24, 1974, she filed this petition to vacate and set aside the adoption. She alleged that she signed the consent to Robin's adoption only because Billie King threatened to kill her if she refused and that she was afraid and believed Billie King would carry out her threat because she knew that Billie King had previously shot one man, beaten another man, and stabbed a third man. She alleged that appellees obtained the adoption by perpetrating fraud upon the court by concealing from the Department of Welfare and from the court the fact that Billie King's own children had been taken from her because she was an unfit mother; and by concealing Laura's whereabouts and the whereabouts of her husband, Bobby Osborne, whom she alleged to be Robin's father. Laura alleged that appellees did know of their whereabouts and that if the Department investigator had been able to talk with them the adoption would not have gone through. She alleged that subsequent to the adoption Billie King had threatened to kill her if she tried to regain custody of Robin and that Billie King had also threatened to kill Bobby Osborne. She prayed that the adoption decree be vacated and set aside and that Robin's custody be restored to her.

At trial, all the circumstances surrounding Laura's execution of the consent, the means by which the Kings kept custody of Robin, and the manner and means by which the Kings obtained Robin's adoption were disputed by the parties.

The court ruled adversely to Laura. On appeal she submits four major propositions of error which can be summarized as follows: (1) that the decision of the trial court was contrary to the law and the evidence, for the evidence clearly showed that the appellees obtained her consent through fraud, coercion and undue influence and that appellees obtained the adoption decree by perpetrating fraud upon the court and upon herself and her husband, Bobby Osborne—Robin's father; (2) that the court erred by refusing to allow appellant to introduce evidence pertaining to Robin's best interests; (3) that the court erred in refusing to allow the pleadings to be amended to conform to the evidence, permitting Bobby Osborne to be added as a party plaintiff; and (4) that the court's decision violated appellant's constitutional rights and the constitutional rights of her husband, Bobby Osborne.

We agree with each of appellant's contentions and reverse the trial court with directions to vacate and set aside the adoption decree and to restore custody of Robin to appellant.

Insofar as possible we shall attempt to treat the contentions of error pertaining to appellant separately from those pertaining to her husband, Bobby Osborne, the alleged natural father of Robin.

## I.

■ The record supports appellant's assertions that her written consent to Robin's adoption was obtained by means of fraud, threat, coercion and undue influence on the part of appellee, Billie King. Appellant's testimony in support of those claims was not refuted by any credible testimony.

Laura testified that she signed the consent to Robin's adoption only because Billie King threatened to kill her and her father (Jerry King) if she refused. Laura stated that on June 24, 1969, she and her week-old baby were in the car with Billie King when Billie King told her that they were going to Wewoka and that "she was gonna shoot my father again and that she was gonna kill me if I didn't give the baby to her, adopt the baby to her." Laura stated that she believed Billie King would carry out her threats because Billie King had shot her father a year and a half prior to Robin's birth.

Laura stated that after they arrived in Wewoka, they went to a lawyer's office and that she remained in the reception room while Billie King went in and talked to the lawyer (Raymond Criswell). After about five minutes Billie King and the lawyer came out, told her to come to the courthouse, and the three of them went to the courthouse.

Laura testified that she was crying when she appeared before the Judge (Bob Howell), that he talked for a long time but she didn't understand what he was saying, and that he then handed her a piece of paper and told her to sign it. Laura stated that she did sign the document but that she didn't know what she was signing.

There is no record of the relinquishment and consent proceeding before Judge Howell. Although Laura was a minor, she was not represented by counsel.

By stipulation of the parties, a telephone conversation with Judge Howell took place to determine his recollection of Laura's consent and the parties agreed that if present, his testimony would have been as follows:

"BY MR. HOOVER: As I understood Judge Howell's answers to the questions that were asked, they were basically as follows: 1. That Judge Howell has no independent recollection of this particular case or of the day in question wherein the consent to adopt was signed in his presence. When asked whether or not— whether or not Mrs. Osborne was in a state of duress or whether or not Judge Howell could describe her mental and physical condition at the time of signing the waiver, his reply was that he had no independent recollection. He indicated that it would be pure conjecture on his part to answer the question with regard to whether or not Mrs. Osborne might have been in a state of duress created by some third party and thus be unaware of it or of the condition.

BY MR. HARGRAVE: I—I—I didn't talk to him. If the judge (interrupted)

BY THE COURT: I asked him—but then I asked him the question if she was crying, would he have permitted her to sign and he says 'no.' "

Judge Howell's general statement that he would not allow a consent to an adoption to be signed by someone who was crying does not refute Laura's testimony that she was acting under duress and threat, that she was distraught, and that she did not know what she was signing. There is absolutely nothing before us to indicate that Laura understood the nature of the document she signed, or that she signed it voluntarily.

Billie King's account of the circumstances surrounding Laura's signing of the consent before Judge Howell was impeached by her testimony given under oath before Judge Frank Seay in a previous hearing on this action.

At the March 25, 1976 hearing on the motion to vacate now before us, Billie King testified that she was *present* when Laura appeared before Judge Howell, that Laura

was not crying and that Judge Howell advised Laura that by signing the consent she was giving up her rights to the baby. This testimony appears in the transcript as follows:

"Q. Just go ahead and tell us about it.
A. . . . we went down there on a—she was born on Tuesday night, we went down to the hospital on Saturday and got her out, took her home, and that was on Saturday, the following Monday we came to Wewoka and—and went to Criswell's office; and Mr. Criswell, Laura and I went to—to up in here somewhere, and Judge Howell signed the papers. She signed the paper and he asked her three different times, he said 'Young lady, you know you're giving up all rights to this child (interrupted)

\* \* \* \* \* \* ⌐

"Q. Mrs. King, you—you were there when (interrupted)
A. Yes, uh-huh.
Q. Bob—you heard Bob Howell say (interrupted) \* \* \*
A. No, sir, she wasn't crying. She willingly signed the papers, and Judge Howell, three different times he'd say, 'Young lady, you're giving up all rights to this child,' he says, 'you realize that, and that you can have no claim on her,' he says, 'after you signed these papers,' and she willingly signed them of her own accord. I hadn't threatened her, we'd even talked about it (interrupted)

\* \* \* \* \* \*

"Q. . . . did you—was the defendant crying at the time?
A. No, sir, huh-uh, not at all.
Q. Did she ever cry during the hearing with—the meeting with Judge Howell at all?
"A. No, sir, not one time. And I have never threatened that girl in my life.

\* \* \* \* \* \*

"Q. \* \* \* And you say Judge Howell didn't browbeat her and (interrupted)
A. No, sir, huh-uh, not—he—he asked her three different times, this is the very words he said, he said, 'Young lady,' he said, 'you know what you're giving up'— he said, 'you realize you're giving up this child and that you will never have 'no' more right on this child?' And she stood there and shook her head. He asked her again and she stood there and she said, 'Yes, sir,' and then the third time, he—he gave her three—asked her three different times, she just went right ahead and signed 'em; and there was no threat whatsoever that I have ever done to that girl."

In her previous sworn testimony given in the hearing before Judge Seay on July 15, 1974, which was put into evidence by stipulation at trial for the purpose of impeachment, Billie King testified that she was *not present* when Laura signed the consent before Judge Howell. The following questions were posed to Billie King by her Attorney, Raymond Criswell:

"Q. And you remember us going up before Judge Howell, do you not?
A. Yes, sir.
Q. I made you stay outside the courtroom, didn't I?
A. Yes, sir.
Q. And any conversation had in there, it was without you being present, was it not?
A. Uh-huh."

The trial court sustained the Kings' objections to Laura's testimony that after she signed the consent, Billie King threatened to kill her if she attempted to get Robin back. Billie King denied having ever threatened Laura, either before or after she signed the consent. The trial judge sustained the Kings' objections to appellant's questioning of Billie as to whether she had ever shot anyone. At the hearing before Judge Seay, however, Billie King admitted that she shot Jerry King in 1968 and that she had previously shot a man named Jimmy Smith. At trial, Jerry King denied that Billie had ever shot him although his denial was impeached by his previous admission before Judge Seay that Billie had indeed shot him.

■ The trial court's refusal to allow appellant to introduce evidence of Billie King's loss of custody of her own two children by reason of neglect and Robin's truancy from school was error.

It is not necessary to set forth here the many portions of testimony which showed that the Kings were not desirable adoptive parents. Because of our disposition of this matter, it suffices to note that from the evidence which he did hear, the judge was sure that Robin's best interests, although not determinative, were not served by the adoption.

Under the facts before us we cannot sustain the trial court's determination that the evidence failed to support Laura's claim that her consent was obtained by fraud and duress.

■ Adoption statutes are to be strictly construed in favor of the natural parents where the controversy is between the natural parents and persons seeking to destroy that status. *Mann v. Garrette*, Okl., 556 P.2d 1003 (1970); *In re Adoption of Graves*, Okl., 481 P.2d 136 (1971).

## II.

■ We agree with appellant that Robin's adoption violated Bobby Osborne's right to due process of law and that the trial court erred in refusing to allow Bobby Osborne to be joined as a party plaintiff to this proceeding to vacate and set aside the decree.

Laura pled and testified that Bobby Osborne is Robin's father. Bobby Osborne testified that he is Robin's father. He stated that he became aware of his paternity in August of 1969 when Billie King brought the baby to him and advised him that he was her father and that they (the Kings) had adopted her. Bobby Osborne is listed on Robin's birth certificate as her father. This is prima facie evidence of the fact. 63 O.S.1971, § 1–324.

Bobby Osborne testified that at all times since August of 1969, he had publicly acknowledged Robin as his child; visited with her at the Kings', received her into his home, held her out to his family and acquaintances as his child, furnished the Kings with money for her support and given her gifts. His testimony was verified by other witnesses.

Laura and Bobby Osborne contend that the Kings knew that Bobby was Robin's father and that the Kings obtained Robin's adoption by perpetrating fraud upon the court and upon them by concealing from the court the fact that Bobby Osborne was Robin's father and falsely representing to the court that her father was unknown.

The Kings only "defense" to this challenge was that they believed Edison Sealy, not Bobby Osborne, to be Robin's father. The Kings did not deny that they knew Bobby Osborne claimed to be Robin's father. They just didn't believe him. On direct examination, Billie King testified as follows:

"Q. How old is she [Robin] now?

A. She's six.

Q. How long had—I'm asking you this, how long had—ago had it been since you first found out that a Bobby Osborne was claiming that he was the father of this child?

A. It's been about five years ago. He claims it is, but I don't believe that she is."

Robin was born on June 16, 1969. Laura and Edison Sealy were married approximately one month later.

Billie King testified that Laura told her that Edison Sealy was the father and that was why she wanted to marry him. Jerry King testified that Edison Sealy and his father told him that Edison was the father and that he wanted to marry Laura and "make things right." Jerry King stated he gave his consent because Laura was underage, allowing Edison and Laura to be married.

In spite of this "knowledge" of Robin's paternity, which the Kings now assert they acquired in 1969, when they filed their petition for Robin's adoption in *1973,* and attached thereto Laura's consent executed in 1969, they *did not reveal either that they*

*believed Robin's father to be Edison Sealy or that Bobby Osborne claimed to be her father.* Pursuant to appellees' petition, the district court ordered the State Welfare Department to conduct an adoption investigation and report the findings to the court, as required by 10 O.S.1971, § 60.13.

The Kings advised the welfare worker conducting the investigation that Robin's father was *UNKNOWN.*[1]

The adoption decree which the Kings caused to be prepared and entered in this action, recites that "It appearing to the court that the father of Robin is *unknown.*"

By reason of the Kings' concealment of Robin's father's identity from the court and their knowingly false representation that her father was unknown, he received no notice of the adoption and did not consent.

■ It is fundamental that notice and parental consent are jurisdictional prerequisites to the adoption of a legitimate child. 10 O.S.Supp.1973, § 60.6; 10 O.S.Supp.1975, § 60.7. An adoption granted without parental consent is void, e. g., *Klutts v. Blackbird*, Okl., 198 Okl. 26, 174 P.2d 361 (1946). Appellant contends that through Bobby Osborne's public acknowledgement of his paternity of Robin, he legitimized her from the moment of her birth of *all* purposes (10 O.S.1971, § 55) and that she was therefore his "legitimate" daughter and could not be adopted without his consent. Appellant concedes that the effect of a father's public acknowledgement of paternity and receiving his child into his home under § 55, supra, has not been extended past purposes of inheritance, but she contends we should extend it here and find that because of Bobby Osborne's actions, Robin was his "legitimate" daughter within the scope of 10 O.S.1971, § 60.6. It is not necessary to delve into this statutory issue, for even as Robin's unwed father, Bobby Osborne had the right to receive notice of the adoption

of his illegitimate daughter. His rights to receive notice of her adoption and to have an opportunity to be heard in the matter were of constitutional dimension.[2] *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

Under either the Kings' or the appellant's theory of the case, Robin was never a child eligible for adoption. The Kings' own testimony showed—clearly and beyond all doubt—that they obtained Robin's adoption by perpetrating fraud upon the court as to a jurisdictional fact. They misrepresented to the court that Robin's father was "unknown". In fact, the Kings, by their own testimony: (1) knew that Bobby Osborne claimed to be Robin's father; and (2) believed that Edison Sealy was her father.

The district court was induced into assuming jurisdiction over Robin's adoption by the Kings' fraud and perjury.

■ We have repeatedly held that where the court has been deceived by a fraudulent material jurisdictional allegation, and the court is thereby made by an instrument of injustice, equity will intervene to prevent the perpetrator from reaping the benefit of the advantage which was unfairly gained. In such a case, the manner in which the fraud is effected is of little significance. The court will look to the effect of the act and inquire if the result is the consequence of the fraud. See, *State, ex rel. Burk v. Oklahoma City*, Okl., 522 P.2d 612 (1974); *Jones v. Snyder*, 121 Okl. 254, 249 P. 313 (1926); *Johnson v. Petty*, 118 Okl. 178, 246 P. 848 (1925); *Cone v. Harris*, 104 Okl. 114, 230 P. 721 (1924).

False representations given to establish jurisdiction by which the court is imposed upon and induced to exercise jurisdiction where none exists requires that "In such cases courts of equity grant relief, not only to prevent a wrong to the injured party, but to frustrate an attempt to make the

1. Additionally, it should be noted that the Kings advised the Department Investigator that Laura's whereabouts were "unknown". It was clear from Jerry King's testimony that, in fact, they had known that Laura was living in Oklahoma City with members of her family.

2. This protection of fathers of illegitimate children is not statutory in Oklahoma, 10 O.S.1971, § 1131, as amended Laws 1977, Ch. 259, § 18.

court an instrument of oppression in aid of a surreptitious sham founded on wrongful artifice." *Johnson v. Petty, supra*, at 850.

The adoption was void ab initio [*State, ex rel. Burk v. Oklahoma City, supra*], and we so hold.

We are not concerned here with "innocent" adoptive parents. Billie and Jerry King, according to their own testimony, deceived the court as to Robin's eligibility for adoption, as well as their own fitness to be adoptive parents. The record shows on its face that this entire proceeding, from beginning to end, was riddled with fraud perpetrated upon both the court and the natural parents by the adoptive parents. There is no possibility that setting aside this adoption will threaten innocent adoptive parents who have acted in good faith and with honesty to obtain the adoptions of their children. Because of the fraud perpetrated by the adoptive parents, there are no public policy considerations which favor allowing this adoption to stand.

We feel constrained to comment upon certain other defects of this adoption proceeding.

While, in our opinion, the issues discussed above are so overwhelming that they dwarf the significance of these additional problems, we offer these comments with the hope that these avoidable defects will be prevented in future adoptions.

The Legislature has placed a specific burden upon agencies such as the Department of Welfare to conduct, upon order of the court, an *investigation* of the circumstances surrounding a proposed adoption.

The first determination which must be made is whether the child is eligible to be adopted.

Title 10 O.S.1971, § 60.13, provides in part that:

"Such investigation shall include the conditions and antecedents of the child for the purpose of determining whether he is a *proper subject* for adoption." (emphasis added)

The social worker here made no attempt to investigate Robin's eligibility for adoption independent of her conversation with the Kings. She testified that it was a matter of policy in private adoptions *not* to speak with the natural parents when the prospective adoptive parents indicate that the natural parents consented to the adoption.

As this case well illustrates, limiting knowledge of a child's eligibility for adoption to that obtained from the adoptive parents is dangerous. Under the procedure followed here, a kidnapped child would have been recommended for adoption by the Department.

A logical place to start such an investigation is with a child's birth certificate. Here, the birth certificate revealed Bobby Osborne to be Robin's father. This whole proceeding might have been avoided if the social worker charged with the duty of investigating, had investigated.

■ Also, the extreme importance of the role of district judges in acknowledging a consent to an adoption cannot be emphasized too strongly. It is incumbent upon a judge to take whatever steps are necessary to thoroughly protect the rights of the relinquishing natural parent. Because that relinquishment and consent will later form the legal basis for the creation of the adoptive family unit, the judge must exercise all available precautions to insure its integrity.

■ For these reasons, we believe that a record should always be made when a natural parent relinquishes his or her rights to a child, and we urge district judges to make a record of every such proceeding.[3]

■ The court should thoroughly advise the relinquishing parent of the nature of his or her actions, and of the seriousness of the attendant consequences. As completely as possible, the court should attempt to ascertain whether the natural parent has an intelligent comprehension of their action and try to determine whether the action is taken voluntarily, without being obtained

**3.** 10 O.S.1971, § 1111.

by reason of fraud, duress, or promise by another. Attorneys representing adoptive parents and adoption agencies, as well as attorneys representing relinquishing natural parents, should insist that these measures be taken to fully protect their clients, and more importantly, to avoid subsequent emotionally traumatic custodial changes of the adopted child.

The order of the district court is reversed. This action is remanded with directions to vacate and set aside the decree of adoption and to restore custody of Robin to appellant, her natural mother.

LAVENDER, V. C. J., and WILLIAMS, IRWIN, BARNES and DOOLIN, JJ., concur.

BERRY, J., concurs in result.

DAVISON, J., dissents.