IN the INTEREST OF D.L.S., a person under the age of 18: T.M.F., Appellant-Petitioner,

v.

CHILDREN'S SERVICE SOCIETY OF WISCONSIN, Respondent.

Supreme Court

*Nos. 81–1920, 82–931. Argued March 2, 1983.—Decided April 26, 1983.*

(Also reported in 332 N.W.2d 293.)

For the petitioner there were briefs and oral argument by *Kenneth L. Lund,* assistant state public defender.

For the respondent there was a brief by *William Hinkfuss* and *Bittner, Hinkfuss, Sickel & Calewarts,* Green Bay, and oral argument by *William Hinkfuss.*

Amicus Curiae brief was filed by *Neil R. McKloskey,* Green Bay, as *Guardian ad Litem* for D.L.S.

SHIRLEY S. ABRAHAMSON, J.  This is a review of an unpublished decision of the court of appeals filed September 21, 1982, affirming two orders of the circuit court for Brown county, John C. Jaekels, Circuit Judge.[1] The circuit court, on petition of T.M.F., ordered termination of T.M.F.'s parental rights to her infant son, D.L.S., on

---

[1] The juvenile court is the circuit court assigned to exercise jurisdiction under the Children's Code. Sec. 48.02, Stats. 1979–80. The juvenile court has exclusive jurisdiction over the termination of parental rights to a minor. Sec. 48.14.

concluding that T.M.F.'s consent to the termination was voluntary and informed. Sec. 48.41, Stats. 1979–80.[2] Subsequently the circuit court entered an order denying

[2] Sec. 48.41, Stats. 1979–80, reads as follows:

"48.41 **Voluntary consent to termination of parental rights.** (1) The court may terminate the parental rights of a parent after the parent has given his or her consent as specified in this section. When such voluntary consent is given as provided in this section, the judge may proceed immediately to a disposition of the matter after considering the standard and factors specified in s. 48.426.

(2) The court may accept a voluntary consent to termination of parental rights only as follows:

(a) The parent appears personally at the hearing and gives his or her consent to the termination of his or her parental rights. The judge may accept the consent only after the judge has explained the effect of termination of parental rights and has questioned the parent and is satisiied that the consent is informed and voluntary; or

(b) If the court finds that it would be difficult or impossible for the parent to appear in person at the hearing, the court may accept the written consent of the parent given before a judge of any court of record. This written consent shall be accompanied by the signed findings of the judge who accepted the parent's consent. These findings shall recite that the judge questioned the parent and found that the consent was informed and voluntary before the judge accepted the consent of the parent.

(c) A person who may be the father of a child born out of wedlock, but who has not been adjudicated to be the father, may consent to the termination of any parental rights that he may have as provided in par. (a) or (b) or by signing a written, notarized statement which recites that he has been informed of and understands the effect of an order to terminate parental rights and that he voluntarily disclaims any rights that he may have to the child, including the right to notice of proceedings under this subchapter.

(3) The consent of a minor or incompetent person to the termination of his or her parental rights shall not be accepted by the court unless it is joined by the consent of his or her guardian ad litem. If the guardian ad litem joins in the consent to the termination of parental rights with the minor or incompetent person, minority or incompetence shall not be grounds for a later attack on the order terminating parental rights."

T.M.F.'s motion for rehearing on the termination order, finding that no new evidence warranted a rehearing. Sec. 48.46, Stats. 1981–82.[3]

The issue on appeal is whether the circuit court erred in concluding that T.M.F.'s consent to the termination of her parental rights was voluntary and informed. The court of appeals affirmed the orders of the circuit court. We reverse the court of appeals because we conclude that the proceedings before the circuit court were inadequate and the circuit court did not have sufficient information upon which to base its conclusion. We remand the matter to the circuit court to permit T.M.F. to withdraw her petition.

On June 27, 1981, T.M.F. (nearly 16 years old) gave birth to a son, D.L.S. The child was placed in a temporary foster home where he still lives. On August 25, 1981, T.M.F. filed a petition for termination of her and the putative father's parental rights. On the same day, the circuit court appointed two guardians ad litem, one for T.M.F. and one for D.L.S., held a hearing on T.M.F.'s petition, and signed the termination order. Within two weeks after the hearing T.M.F. communicated with the State Public Defender seeking to appeal the termination order. The appeal was filed on September 25, 1981, within the 30-day time period set forth in sec. 48.43(6), Stats. 1979–80. *See In the Interest of J.D.,* 106 Wis. 2d 126, 315 N.W.2d 365 (1982). T.M.F. then moved to stay the appeal and filed a motion for rehearing on the ground of newly discovered evidence, sec. 48.46.

---

[3] Sec. 48.46, Stats. 1979–80, reads as follows:

"**48.46 New evidence.** The parent, guardian or legal custodian of the child or the child whose status is adjudicated by the court may at any time within one year after the entering of the court's order petition the court for a rehearing on the ground that new evidence has been discovered affecting the advisability of the court's original adjudication. Upon a showing that such evidence does exist, the court shall order a new hearing."

The court of appeals stayed the appeal and remanded the case for further proceedings. After a hearing, the circuit court denied the motion for rehearing. The appellate proceedings then continued, and the court of appeals affirmed both orders of the circuit court.

T.M.F. raises several issues before this court concerning the adequacy of the first hearing at which the circuit court terminated her parental rights to D.L.S. She contends that she did not give voluntary and informed consent to the termination of her parental rights as sec. 48.41, Stats. 1979–80, requires; that she was not advised that she had a right to counsel at her own expense at the termination hearing, sec. 48.23(5); and that the termination proceedings were invalid because the interests of the public were not represented as sec. 48.09(6) requires. T.M.F. also contends that she had presented sufficient new evidence to warrant a rehearing under sec. 48.46. Since we conclude that the circuit court erred in concluding that T.M.F. gave a voluntary and informed consent to the termination of her parental rights, we do not decide the other issues she raises.

■

A judicial proceeding terminating parental rights implicates a parent's fundamental rights. *In re Termination of Parental Rights to T.R.M.,* 100 Wis. 2d 681, 689, 303 N.W.2d 581 (1981). At stake is the parent's interest in the companionship, care, custody, and management of his or her child. This court has recognized that these interests are "cognizable and substantial" and that the integrity of the family is subject to constitutional protection through the due process clause of the state and federal constitutions. *In Interest of J.L.W.,* 102 Wis. 2d 118, 132, 133, 136, 306 N.W.2d 46 (1981). "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment."

*Santosky v. Kramer*, 455 U.S. 745, 753 (1982).[4]

The state and the parent share an interest in ensuring that the decision to terminate parental status is accurate and just. In view of these concerns, the Wisconsin legislature has imposed on the circuit court the responsibility to determine whether the parent's consent to termination of his or her parental rights is voluntary and informed and has set forth the conditions under which the court may accept a parent's voluntary consent. Secs. 48.41, 48.42, 48.422(1), (3), (4), (7),[5] Stats. 1979–80.

---

[4] Courts have addressed the question of due process rights to be accorded parents in proceedings for involuntary termination of parental rights. *Santosky v. Kramer*, 455 U.S. 745 (1982); *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed 2d 640 (1981); *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *State ex rel. Lewis v. Lutheran Social Services*, 59 Wis. 2d 1, 207 N.W.2d 826 (1973), appeal after remand, 68 Wis. 2d 36, 227 N.W.2d 643 (1975); *In Interest of J.L.W.*, 102 Wis. 2d 118, 306 N.W.2d 46 (1981). This court has not addressed the nature of the due process rights afforded parents (who are not declared unfit) in proceedings for voluntary termination proceedings.

[5] Secs 48.422(1), (3), (4), and (7), Stats. 1979–80, provide as follows:

"**48.422 Hearing on the petition.** (1) The hearing on the petition to terminate parental rights shall be held within 30 days after the petition is filed. At the hearing on the petition to terminate parental rights the court shall determine whether any party wishes to contest the petition and inform the parties of their rights under sub. (4) and s. 48.423.

(3) If the petition is not contested the court shall hear testimony in support of the allegations in the petition, including testimony as required in sub. (7).

(4) Any party who is necessary to the proceeding or whose rights may be affected by an order terminating parental rights shall be granted a jury trial upon request if the request is made before the end of the initial hearing on the petition.

(7) Before accepting an admission of the alleged facts in a petition, the court shall:

(a) Address the parties present and determine that the ad-

The circuit court must hold a hearing on the petition to terminate parental rights and give notice to interested persons. Secs. 48.42, 48.422, Stats. 1979–80. The parent personally appears at the hearing and gives his or her consent, but the judge may accept this consent only after the judge has explained the parent's rights at the hearing pursuant to sec. 48.422(1)(4) and the effect of termination of parental rights and after the judge has questioned the parent and is satisfied that the consent is "informed and voluntary." Sec. 48.41(2)(a). The court must take further care when the parent is a minor, as in this case. The circuit court may not accept the minor parent's consent "unless it is joined by the consent of his or her guardian ad litem." Sec. 48.41(3). The parent is also entitled to retain counsel of his or her own choosing and at his or her own expense. Sec. 48.23(5).

The legislatively prescribed procedures underscore the importance of the judicial proceeding to terminate parental rights when the parent has given his or her consent. The judicial proceeding is not a mere formality; the circuit court does not simply rubber-stamp the parent's consent. The circuit court must ensure that the parent has adequately considered the decision to terminate parental rights to the child, surely one of the most difficult decisions a person can ever make.

Because the circuit court's decision on termination of parental rights will form the basis for the future disposition of the child, the circuit court must exercise all available precautions, reflected in its judicial inquiry on

mission is made voluntarily with understanding of the nature of the acts alleged in the petition and the potential dispositions.

(b) Establish whether any promises or threats were made to elicit an admission and alert all unrepresented parties to the possibility that a lawyer may discover defenses or mitigating circumstances which would not be apparent to them.

(c) Make such inquiries as satisfactorily establish that there is a factual basis for the admission."

the record, to ensure that the consent is voluntary and informed. The circuit court's care in making a record of a full inquiry in reaching a decision will further the interests of all concerned: It will help ensure that the circuit court's decision is just and accurate, thereby decreasing the likelihood of appeal, and in the unlikely event of appeal, it will facilitate appellate review. *Adoption of Robin,* 571 P.2d 850 (Okla. 1977); *Guardianship of Baby Boy M.,* 66 Cal App. 3d 254, 274, 135 Cal. Rptr. 866 (1977); *In Re Adoption of Anonymous,* 60 Misc. 2d 854, 304 N.Y.S. 2d 46, 52 (1969). Finality of the circuit court's decision is critical, because the delays and uncertainties involved in appeals and rehearings leave a child "in limbo" for a substantial period of time and may even result in taking a child from an established home life.

No decision of this court has delineated the standard an appellate court should use to review a circuit court's conclusion that the parent's consent to terminate parental rights was voluntary and informed. The court of appeals, without discussion, treated the circuit court's conclusion as a finding of fact which "will be reversed if the finding is against the great weight and clear preponderance of the evidence."[6] The court of appeals thus deferred, to a great extent, to the circuit court's decision.

T.M.F. argues that the circuit court's conclusion that the parent's consent is voluntary and informed involves a mixed question of fact and law and that an appellate court may review the legal conclusion, that is, that the facts fit the legal standard of "voluntary and informed," without deferring to the circuit court's decision. The practical difference between the standard of review used by the court of appeals and that urged by T.M.F. is the degree of finality that a circuit court's decision will have.

---

[6] The court of appeals cited *Bank of Sun Prairie v. Opstein,* 86 Wis. 2d 669, 676, 273 N.W.2d 279 (1979).

The court of appeals' standard makes the decision more final; T.M.F.'s standard, less.[7]

We agree with T.M.F. that the circuit court's conclusion is one of law, but we disagree that the label "question of law" automatically allows the appellate courts free rein in reviewing the circuit court's conclusion. The weight to be given the trial court's conclusion of law depends on the nature of the trial court's decision-making process, the relative expertise of the trial and appellate courts as decision makers, and the need for a narrow scope of review to give finality to the trial court's decision compared with the need for a broad scope of review to achieve uniformity of trial court decisions.

In proceedings to terminate parental rights, the legal conclusion of voluntary and informed consent is derived from and intertwined with the trial court's factual inquiry during which the trial court has had the opportunity to question and observe the witnesses; the trial court is thus better prepared to reach a just and accurate conclusion than is an appellate court. Furthermore, public policy favors finality of the trial court's conclusion as to the nature of the parent's consent. Thus, on review of a trial court's conclusion that the parental consent is voluntary and informed "the appellate court should give weight to the trial court's decision, although the trial court's decision is not controlling." *Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983).

Reviewing the record in this case keeping in mind the need for an appellate court to ensure compliance with the statutory procedures and to give weight to the circuit court's conclusion, we conclude that the inquiry in this

---

[7] T.M.F. analogizes the finding in this case to findings in *State v. Callaway,* 106 Wis. 2d 503, 511, 317 N.W.2d 428 (1982); *Nottleson v. DILHR,* 94 Wis. 2d 106, 116–17, 287 N.W.2d 763 (1980); *Bies v. State,* 76 Wis. 2d 457, 469, 251 N.W.2d 461 (1977).

hearing was inadequate to allow us to defer to the circuit court's conclusion. We conclude that neither the circuit court nor this court can, on the basis of this record, accurately assess whether or not T.M.F.'s consent was informed and voluntary. Accordingly we reverse the decision of the court of appeals and the orders of the circuit court.

The hearing on the termination of T.M.F.'s parental rights was brief and to the point. At the hearing were T.M.F., both T.M.F.'s and D.L.S.'s guardians ad litem, T.M.F.'s mother, and a social worker from the Children's Service Society of Wisconsin who had counseled T.M.F. since T.M.F.'s sixth month of pregnancy. T.M.F. and the social worker testified.

The bulk of the hearing consisted of the circuit court's and T.M.F.'s guardian ad litem's lengthy explanations to T.M.F. about her possible rights and about the nature of the proceedings. After each series of comments and questions, T.M.F. was asked whether she understood. The record is replete with T.M.F.'s responses, consisting of a simple "U'm h'm" or "Yeah," to leading and complex questions asking whether T.M.F. understood the nature of the proceedings, the explanation of the alternatives available to her, and the explanation of the consequences of her consent, and whether she was ready to make a commitment to the court to give up her child.

Several exchanges in the record cast doubt on the assumption that T.M.F.'s affirmative answers reveal her understanding of the proceedings, her rights, or the alternatives available to her.

Beyond establishing the fact that T.M.F. was 15 years old, neither the circuit court nor T.M.F.'s guardian ad litem inquired into T.M.F.'s level of education and general comprehension. There is no showing in the record that T.M.F. had the educational level or ability to understand the complex series of explanations or questions addressed to her.

The record further indicates that T.M.F. may not have understood the nature of the proceedings. Although she responded affirmatively to the general question "Do you understand?" which followed a series of explanations, she responded negatively when asked one question isolated from the rest, that is, whether or not she understood what a jury trial was and that she had the right to have one. The circuit court then explained what a jury trial was but failed to explain that she had a right to a jury trial only if she contested the termination. Sec. 48.422 (4), Stats. 1979–80.

T.M.F.'s affirmative responses also mean little when one sees that the explanations she "understood" were confusing and potentially misleading. At three different times T.M.F.'s guardian ad litem or the circuit judge attempted to explain T.M.F.'s appellate rights; the three statements are not consistent. At least one of the statements concerning appeal would have suggested to a person unfamiliar with court procedures that there was a 30-day period for a "change of mind." This statement is not accurate. Sec. 48.43 (6) provides a 30-day period in which the parent has the right to appeal the decision terminating parental rights, not a 30-day period in which a parent may rescind consent to termination. The issue the appellate court decides is whether this order terminating T.M.F.'s parental rights is invalid because T.M.F.'s consent was not voluntary and informed. Neither the circuit court nor the guardian ad litem told T.M.F. about the difficulties of overturning the circuit court's decision on appeal. Thus we do not know, from the record, whether T.M.F. "understood" that she could appeal the circuit court's decision or, alternatively, that she could change her mind.

Even more troublesome is the circuit court's, and possibly T.M.F.'s, confusion about T.M.F.'s alternatives to terminating her parental rights. T.M.F. appears to have been searching for a way not to terminate her parental rights but to have her infant live outside of her parents' home. T.M.F.'s stepfather had told T.M.F. he would leave the house if she kept the infant. T.M.F. would need financial help to keep the baby, but because her parents refused to apply for welfare she would need funds that were not dependent on her parents' assistance. There was no disclosure at the hearing that T.M.F. knew that she might have been able to keep her child in long-term foster care at public expense while she lived in her parents' home, finished high school, and visited her child frequently. In fact, the circuit court was confused about possible alternatives; the judge disagreed with the social worker about the alternatives available to T.M.F.,[8] and we do not know what T.M.F. understood her alternatives to be.

[8] "COURT: But you're informed there are a lot of things available. You can have welfare. You can go on ADC. You can get parenting classes. You can have the child put temporarily in a foster home until you get more on your feet and learn the skills necessary to raise a little child. There's all sorts of things available to you at no cost to you at all, if you should decide that you want to keep that little child. Do you understand that?

"T.M.F.: Yeah.

"COURT: What are all the things that are available other than just plain welfare and, of course, you know if you get welfare, you get housing allowance. You get food stamps. You get free doctor, free hospital, free lawyer, free accountant, free psychologist, free eye glasses, free dentist.

"SOCIAL WORKER: Not for a 15-year-old, Your Honor.

"COURT: Don't you?

"SOCIAL WORKER: No.

"COURT: That's discriminatory. How can you discriminate?

"SOCIAL WORKER: The law indicates that she is a minor.

"COURT: Well, anyhow. All these things one way or another are available to you."

T.M.F.'s guardian ad litem should have investigated the alternatives prior to the hearing, advised T.M.F., and ensured that she did, in fact, understand the proceedings, her rights, and alternatives. This court has said that the guardian ad litem must be appointed in sufficient time to make a full and adequate investigation to determine which of the available alternatives was in the best interests of his minor client. *Cf. de Montigny v. de Montigny,* 70 Wis. 2d 131, 142, 233 N.W.2d 463 (1975) (child custody in divorce proceeding). According to the court records, the guardian ad litem had been appointed on the day of the hearing. The record does not show that T.M.F. had consulted with or was counseled by her guardian ad litem.[9] The record does not show that the guardian ad litem's function was described to T.M.F., and she was not told the difference between a guardian ad litem and counsel or that she was entitled to be represented by counsel at her own expense.[10]

A parent's full knowledge of his or her alternatives to terminating parental rights is a particularly important ingredient to the determination of whether consent to terminate parental rights is informed and voluntary. When the parent is himself or herself a juvenile, living in his or her parents' home, and understandably subject to

[9] We limited our review to the record of the original hearing, not the hearing on the motion. At the hearing on the motion there was some evidence as to the consultation between T.M.F. and the guardian ad litem.

[10] Secs. 48.23(5) and (6), Stats. 1979–80, provide as follows:

"(5) COUNSEL OF OWN CHOOSING. Regardless of any provision of this section, any party is entitled to retain counsel of his or her own choosing at his or her own expense in any proceeding under this chapter.

"(6) DEFINITION. For the purposes of this section, "counsel" means an attorney acting as adversary counsel who shall advance and protect the legal rights of the party represented, and who may not act as guardian ad litem for any party in the same proceeding."

parental pressure to give up a child, the parent must be advised about these alternatives to ensure informed and voluntary consent.

The hearing reveals that T.M.F. knew that her parents wanted her to consent to termination of her rights to D.L.S. She testified that she had "flip-flopped" in her decision to give up the child and in response to a question asking whether anyone had threatened her regarding the giving up of her child, T.M.F. said that her stepfather had told her he would move out of the home if she kept her child. She testified that his statement had some influence on her decision to terminate her parental rights.[11]

The circuit court was apparently and understandably aware of the possible effect the stepfather's statement had on T.M.F.'s decision. The circuit court did not, however, question T.M.F. further about her stepfather but, rather, discussed the matter with T.M.F.'s mother.[12]

---

[11] "Q. Have they threatened you—you know—saying you have to do this or else we will do something to you?

"A. Just that my—just that my stepdad would move out if I did keep him.

"Q. If you kept him, your stepfather would move out?

"A. Yeah.

"Q. Do you feel that that is a major reason why you're giving up this child at this time?

"A. A little bit, yes.

"Q. Okay. Do you—do you feel that he would honestly move out if you did keep the child?

"A. Yeah.

"Q. Are you—are you concerned about that—that he would move out?

"A. Yeah."

[12] "THE COURT: Well, that's a choice she's making by herself. Seems to me that it would be coercive to some extent, but life is full of coercion but it's nothing that originates from the Social Services or the Court or anyone. It's a domestic situation. I presume you're remarried and your husband doesn't care about the idea of having a little baby in the house.

We cannot—and do not—conclude from this record that T.M.F.'s parents "coerced" T.M.F.'s decision, or that any other person or entity coerced or put any pressure on T.M.F. The record shows a family terribly concerned about T.M.F.'s and the infant's welfare attempting to give, out of their love and experience, the best possible advice to their daughter. Parental advice, argument, or persuasion do not constitute coercion if the individual who has to make the decision acts freely when he or she gives consent, even though the consent might not have been executed except for the advice, argument, or persuasion. *Kathy O. v. Counselling & Family Serv.*, 107 Ill. App. 3d 920, 438 N.E.2d 695 (1982).

The record in this case shows that T.M.F. based her consent, at least in part, on her special concern for her mother, stepfather, and step-siblings, whose well-being and happiness may have been dependent on her decision. Consent induced by a threat of harm to loved ones bears particular scrutiny. The circuit court should have been conscious of the psychological pressures that the threat

---

"T.M.F.'s MOTHER: That's not why he said it.

"THE COURT: Why?

"T.M.F.'s MOTHER: We have four children. We support three others. It's very hard.

"THE COURT: Okay.

"T.M.F.'s MOTHER: If there was any way she could keep it, we would. She's 15.

"THE COURT: Well, that's right. From a practical standpoint it's just unrealistic for her to keep a little child. She is just a child herself.

"T.M.F.'s MOTHER: That's right. She can't attend school and care for a child. I work. I can't—I can't afford to stay home.

"THE COURT: Well, those were all considerations.

"T.M.F.'s MOTHER: He only said that in her interest.

"THE COURT: Yes.

"T.M.F.'s MOTHER: Because he cares for her enough for her welfare.

"THE COURT: Sure.

"T.M.F.'s MOTHER: That's the only reason he said it."

created, should have questioned T.M.F. more closely, and should have reviewed carefully alternatives, if any, which would have allowed her to keep her child and not have forced the stepfather to leave the home. *Cf. State ex rel. White v. Gray,* 57 Wis. 2d 17, 28–29, 203 N.W.2d 638 (1973) ; A.L.I., *A Model Code of Pre-Arraignment Procedure,* Tent. Draft No. 5, Commentary to sec. 350.3, pp. 615–16 (1975). The circuit court must ensure that the decision to consent is T.M.F.'s, not her parents', partly by ensuring that T.M.F. has received counseling that counteracts parental pressure by revealing to her alternatives, if any, that may enable her to keep the child without damaging her family's lives.

In conclusion, our examination of the record reveals that while the leading questions and T.M.F.'s yes and no answers might arguably support the circuit court's conclusion of law that T.M.F.'s consent was voluntary and informed, a closer look at the record leaves the clear impression that T.M.F.'s interrogation was cursory and perfunctory. Instead of asking leading and compound questions, the circuit court and T.M.F.'s guardian ad litem should have asked questions designed to elicit answers from T.M.F. which would have required her to explain in her own words what she understood and what her reasons were for terminating her parental rights. Despite several warning signals during the hearing, neither T.M.F.'s guardian ad litem nor the circuit court really probed to be sure that T.M.F. understood the proceedings, understood that her decision to terminate her parental rights was final, understood that she did not have a 30-day period in which to change her mind, and, most important, understood the alternatives to terminating her parental rights. The infant's guardian ad litem also has an interest in the finality of the proceedings and thus has an interest in ensuring that the parent's consent is voluntary and informed.

The record in this case is inadequate under the statutes to allow the circuit court or this court to determine whether the consent was voluntary and informed. *See Adoption of Robin,* 571 P.2d 850 (Okla. 1977). Accordingly, we reverse the decision of the court of appeals affirming the orders of the circuit court and remand the cause to the circuit court.

We do not and cannot set forth precisely what information must be given to the parent in each termination hearing or what questions must be asked or what responses must be elicited on the record to ensure that a sufficient judicial inquiry is made to determine that the consent is voluntary and informed. Each parent and each family will be different. In this nonadversarial setting, the circuit court has a unique opportunity and a special obligation to be vigilant in protecting the interests of all parties. We do set forth the basic information the circuit court must ascertain to determine on the record whether consent is voluntary and informed:

1. the extent of the parent's education and the parent's level of general comprehension;

2. the parent's understanding of the nature of the proceedings and the consequences of termination, including the finality of the parent's decision and the circuit court's order;

3. the parent's understanding of the role of the guardian ad litem (if the parent is a minor) and the parent's understanding of the right to retain counsel at the parent's expense;

4. the extent and nature of the parent's communication with the guardian ad litem, the social worker, or any other adviser;

5. whether any promises or threats have been made to the parent in connection with the termination of parental rights;

6. whether the parent is aware of the significant alternatives to termination and what those are.

For the reasons set forth, the decision of the court of appeals affirming the order of the circuit court terminating the parental rights of T.M.F. to her son D.L.S. is reversed. The cause is remanded to the circuit court to permit T.M.F. to withdraw her petition.

*By the Court.*—The decision of the court of appeals is reversed; the order of the circuit court terminating T.M.F.'s parental rights and transferring guardianship of D.L.S. to the Children's Service Society of Wisconsin is reversed; the cause is remanded to the circuit court to permit T.M.F. to withdraw her petition.