28 P.3d 1163 (2001)
2001 OK CIV APP 92
In the Matter of T.D., deprived child.
Pamela Dawn LaTray, Appellant,
v.
State of Oklahoma, ex rel. Department of Human Services, and Sean Loftin, Appellees.
No. 95,320.
Court of Civil Appeals of Oklahoma, Division No. 2.
June 19, 2001.
M. Michael Arnett, Robert J. Meyer, Arnett Law Firm, Oklahoma City, OK, for Appellant.
D. Kent Meyers, Paige S. Bass, Crowe & Dunlevy, and Richard M. Ault, Public Defender, Oklahoma City, OK, for Child, T.D.
Diane Box, Assistant District Attorney, Oklahoma City, OK, State of Oklahoma for Appellee.
Don R. Nicholson, II, Jeffrey M. Love, Eagleton, Nicholson, Pordos & Pardue, P.C., Oklahoma City, OK, for Appellee Sean Loftin.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 2.
*1164 COLBERT, Judge:
¶ 1 Mother, Pamela Dawn LaTray, appeals the district court's order terminating her parental rights in T.D. and awarding custody to *1165 Father, Sean Loftin. The issue on appeal is whether the district court erred in terminating Mother's rights based on the terms of a mediation agreement between Mother, Father, the District Attorney, and attorneys representing T.D. We conclude the district court did err, reverse its order as to the termination of Mother's parental rights only, and remand for further limited proceedings consistent with this order.
¶ 2 Mother is the biological mother of T.D., born February 22, 1992, and Father is T.D.'s biological father. Although Mother and Father cohabited at the time of T.D.'s birth, they separated when T.D. was approximately 8 months old. Mother moved to Oklahoma with T.D., and Father was unable to locate them until T.D. was 3 years old. Mother subsequently married Damien C. LaTray, Sr., and T.D. lived in their home, along with LaTray's biological son.
¶ 3 On September 8, 1997, the State of Oklahoma filed a petition seeking the adjudication of T.D. as deprived.[1] The petition included allegations of physical abuse, exposure to sexual activity, domestic violence, and substance abuse. T.D. was removed from Mother's home and placed with Father and his wife. Mother stipulated to the allegations in the petition on March 23, 1998. On September 30, 1998, State filed an amended petition, asserting that Mother had failed to correct the conditions leading to T.D.'s being adjudicated deprived and seeking the termination of Mother's parental rights.
¶ 4 On October 6, 1999, Mother and her attorney met in mediation with Father, Father's attorney, an assistant district attorney, and three attorneys representing T.D. Following a full day of mediation, they executed an agreement in which Mother agreed to voluntarily relinquish her parental rights to T.D. on the conditions that (1) an independent psychologist and independent pediatrician approve the permanent placement of T.D. with Father; (2) Father agree to not pursue past or future child support for T.D. from Mother; and (3) provisions be made for possible future visitation by Mother with T.D., based on the approval of his therapist and treating physician. In addition, the district attorney agreed that "no act of omission or commission committed by" Mother or her husband occurring before the date of the mediation conference would be used as a basis for terminating their parental rights in a baby born on March 4, 1999. The district court accepted the mediation agreement on October 19, 1999, without comment. There is no transcript of the October 19, 1999, hearing in the record on appeal.
¶ 5 On December 30, 1999, the Department of Human Services (DHS) filed a report with the district court recommending that T.D. remain with Father and his wife in their home and that Mother's parental rights be terminated. The report stated that efforts to reunite T.D. with his Mother had failed and that "[T.D.] continues to have behavioral problems associated with the abuse he has endured." According to the report, Mother had not fulfilled the requirements of her treatment plan and had not maintained contact with DHS. The report also stated that, although Mother and her husband had initiated and completed parenting classes and individual counseling, they had discontinued work with a sexual abuse counselor. The report included the following information:
In the past, [Mother and her husband] have participated in swinger magazines and at the Centerfold Club. [They] also appeared on the Jerry Springer television program in the past displaying their untraditional lifestyle.
¶ 6 On February 25, 2000, the independent assessment of Karen S. Baumann, a psychologist, was filed with the district court in partial satisfaction of the mediation terms. Dr. Baumann reported that she reviewed T.D.'s records for approximately three hours, conducted an initial intake session with Father and his wife, and then spent two hours in their home observing Father, his wife, their two children (ages 1 and 3), and T.D. She described her impressions based on the records and her observations of T.D. and the rest of the family.
¶ 7 Dr. Baumann first outlined the significant psychological issues present in T.D. *1166 upon his removal from Mother's custody.[2] T.D.'s psychological problems resulted in permanent suspension from 1st grade for abusive behavior toward his peers, teachers, and administrators, followed by in-patient hospitalization for two weeks and daily outpatient treatment for six to seven months. T.D. was diagnosed with post traumatic stress disorder, general anxiety disorder, and attention deficit disorder with hyperactivity. Dr. Baumann reported that Father and his wife said T.D. never asked to see Mother and his spontaneous remarks about her were always negative. Dr. Baumann concluded:
[Father and his wife] appear to be emotionally stable and loving parents.
This couple does not make a great deal of money. However, they have spent a great deal of their available income, first to establish paternity and secondly to provide an optimal healing environment for [T.D.] This couple appears to be highly motivated to be good parents. They have invested an inordinate amount of time, energy and commitment seeking help for themselves and [T.D.]
I see nothing that would dictate caution in granting permanent placement of [T.D.] to [Father and his wife].
During my visit in the Loftin home, [T.D.'s] interactions with the two younger children and the Loftin parents were open, spontaneous and positive. Displays of affection and bonding were apparent.
¶ 8 On April 20, 2000, the district court held a hearing to determine if the terms of the mediation agreement had been met. Mother informed the court that Father had been charged with possession of marijuana in January 2000 and requested that he be ordered to submit to a hair analysis. The court denied Mother's request, concluded that the terms of the mediation agreement had been met, ordered the termination of Mother's parental rights, and granted custody of T.D. to Father. Mother appeals.

DISCUSSION
¶ 9 Mother contends on appeal that the district court erred in enforcing the mediation agreement.[3] The use of mediation in the termination of parental rights is untested. Certainly, mediation is encouraged by Oklahoma courts. Vela v. Hope Lumber & Supply Co., 1998 OK CIV APP 162, ¶ 6, 966 P.2d 1196, 1198. However, the use of mediation in a proceeding involving the termination of parental rights for cause has not been considered in any published Oklahoma case of which this court is aware.

I.
¶ 10 We first consider Mother's argument that the mediation agreement should be set aside because Father fraudulently failed to disclose a history of drug and alcohol use during the mediation. A settlement agreement is a contract between the parties and it will be enforced "absent fraud, duress, undue influence, or mistake." Id. Mother would have the mediation agreement set aside for fraud.
¶ 11 First, Mother waived this issue by failing to raise her allegation of fraud to the district court. According to the record on appeal, Mother raised only the fact of Father's arrest. This is not enough to raise the issue of whether Father fraudulently failed to disclose a history of drug abuse. "Matters not first presented to the trial court for resolution are generally not considered on appeal." Stonecipher v. District Court, 1998 OK 122, ¶ 11, 970 P.2d 182, 186.
*1167 ¶ 12 Moreover, there is no evidence in the record to support Mother's assertion that Father has a history of drug or alcohol abuse.[4] Indeed, the record discloses that Father has, for the past several years, voluntarily subjected himself to the oversight and review of DHS and various mental health professionals in the context of T.D.'s status as a deprived child. Apart from this one arrest for misdemeanor marijuana possession, there was no hint, by any of the participants, that Father had any problem with substance abuse.
¶ 13 Finally, the mediation lasted a full day. All the parties, including Mother, were represented by counsel. Mother, who had lived with and conceived a child with Father, had personal knowledge of Father's past behaviors and she should have raised any concerns she might have had arising from that knowledge. No one raised this issue. Mother has failed to establish that the mediation agreement should be set aside because of fraud.

II.
¶ 14 Our finding that Mother has not established fraud, however, does not end our inquiry into the validity of this mediation agreement. Oklahoma's legislature, in constructing the current statutory scheme, has not contemplated the use of mediation in the context of a state-initiated effort to involuntarily terminate parental rights, and this court is troubled by its use. Parental rights are fundamental rights. Indeed, this court has explained that:
"[T]he right of a parent to the care, custody, companionship and management of his or her child is a fundamental right protected by the Federal and State Constitutions."... [B]efore a parent may be deprived of that right he or she must be accorded the full panoply of procedural and substantive safeguards associated with constitutional protections of fundamental rights....
The courts will apply the tests of strict judicial scrutiny to a state law which interferes with the exercise of fundamental rights and liberties explicitly or implicitly protected by the Constitution.
In re Adoption of Blevins, 1984 OK CIV APP 41, ¶¶ 8 9, 695 P.2d 556, 559-60 (citations omitted). We have applied "strict judicial scrutiny" to this mediation process and find that it is seriously lacking in protecting the fundamental due process rights of an individual whose parental rights are in danger of termination. As reflected in the record on appeal, this process lacked a significant procedural protection-that the trial court found a factual basis for its determination that Mother knowingly and voluntarily agreed to the full and final relinquishment of her parental rights in T.D.
¶ 15 A mediation agreement is a contract. Vela, 1998 OK CIV APP 162, ¶ 6, 966 P.2d at 1198. Certain aspects of this agreement appear to run afoul of public policy and could, therefore, render it void or voidable. See Kincaid v. Black Angus Motel, Inc., 1999 OK 54, ¶ 7, 983 P.2d 1016, 1018 ("A void contract is one that is illegal or contrary to public policy."). Nevertheless, "[w]hile courts may declare void those portions of private contracts which contradict public policy, they must do so only with great caution." Schmidt v. United States, 1996 OK 29, ¶ 12, 912 P.2d 871, 875.
¶ 16 Two kinds of agreements violate public policy: First, those that obviously "tend to injure public morals, public health or confidence in the administration of the law" and second, those that "destroy the security of individuals' rights to personal safety or private property." Id. One of our concerns with this mediation agreement is that it purports to release Mother from all accrued and future child support obligation. Such contracts have generally been held to be against public policy. State Dep't of Human Servs. v. T.D.G., 1993 OK 126, ¶ 8, 861 P.2d 990, 994.[5] Second, the terms of the agreement *1168 indicate that Mother was trying to protect her parental rights in a newborn baby. The idea of the district attorney trading the rights of one child to be raised in a safe and loving environment for the similar rights of another, younger child would seem to run counter to the public policy of this state.
¶ 17 We are aware that, in these situations, hard choices must be made in order to protect the best interests of the child and, in the same breath, insure against the deprivation of the parent's fundamental rights. This situation is not unlike a criminal case where the court is considering a plea agreement. In such cases, as in this case, the individual entering the agreement with the State does not have equal bargaining power. Therefore, the court must determine that a guilty plea is valid, and, in doing this, the court's only concern is whether "the plea was entered voluntarily and intelligently." Hagar v. State, 1999 OK CR 35, ¶ 4, 990 P.2d 894, 896. The court must consider the totality of the circumstances and must obtain a factual basis for the plea, either by requiring the defendant to make a detailed statement or by looking to other sources. Id. at ¶ 4, 990 P.2d at 896-97. "The factual basis of the plea must be sufficient to provide a means by which the judge can test whether the plea is being entered intelligently." Id. at ¶ 4, 990 P.2d at 897. This factual basis must be stated in the record. Carpenter v. State, 1996 OK CR 56, ¶ 31, 929 P.2d 988, 997; see also King v. State, 1976 OK CR 103, ¶ 12, 553 P.2d 529, 536.
¶ 18 A similar procedure can and should be used where mediation results in a party surrendering a fundamental right such as the parental rights here. The legislature has provided such a procedure for the voluntary relinquishment of parental rights. See 10 O.S. Supp.2000 § 7503-2.3. Section 7503-2.3 requires that the trial judge verify, on the record, that the relinquishing parent has been informed of the consequences of her action, answered certain required questions, and has agreed to the full and irrevocable relinquishment of her parental rights.
The supreme court has cautioned:
The court should thoroughly advise the relinquishing parent of the nature of his or her actions, and of the seriousness of the attendant consequences. As completely as possible, the court should attempt to ascertain whether the natural parent has an intelligent comprehension of their action and try to determine whether the action is taken voluntarily.
In re Adoption of Robin, 1977 OK 219, ¶ 54, 571 P.2d 850, 857. A judge must "exercise all available precautions to insure [the relinquishment's] integrity." Id. at ¶ 52, 571 P.2d at 857.
¶ 19 At its heart, this case is about Mother's voluntary relinquishment of her parental rights in T.D. Mother is, at a minimum, entitled to the procedural safeguards specified by the legislature when it enacted the voluntary relinquishment statutes. There is nothing in the record before this court, however, to indicate that those procedural safeguards were observed in this case. Although Mother was represented by counsel throughout this proceeding and probably was aware of the full consequences of her action, her initial involvement in the process was certainly not voluntary. Moreover, the terms of the agreement indicate that Mother was trying to protect her parental rights in a newborn baby, a consideration no parent should be forced to weigh, particularly in an involuntary process. Also, one of the express conditions to Mother's agreement is the right to continued visitation with T.D., a provision at odds with the complete termination of her rights. Ultimately, Mother's full understanding and acceptance of the results of her agreement are not reflected in the record before us. They must be before this termination can be upheld.
¶ 20 We stress that we are not returning this case and this child to the beginning of this process. The facts reflected in the record before this court concerning this child's situation are deeply troubling and, certainly, DHS believed it had sufficient grounds to move successfully for the involuntary termination of Mother's parental rights in T.D. *1169 However, conspicuously absent from the mediation agreement and the court's order approving the mediation agreement is any reference to the statutory grounds for the termination or findings satisfying the statutory requirements for involuntary termination. All that remains is for the trial court to conduct a hearing to determine on the record whether (1) Mother has voluntarily relinquished her parental rights in T.D. in accord with section 7503-2.3, or (2) there are sufficient grounds for the involuntary termination of Mother's parental rights under 10 O.S. Supp.2000 § 7006-1.1. The court must then enter an order containing factual findings to support its decision.

III.
¶ 21 Mother also asserts the trial court erred in awarding custody to Father. This issue is completely separate from the other issues in this case and Mother's standing to raise it is doubtful, given T.D.'s status as a deprived child. Nevertheless, an award of the primary custody of a minor child will not be reversed on appeal unless it is against the clear weight of the evidence respecting the child's best interest. Kahre v. Kahre, 1995 OK 133, ¶ 19, 916 P.2d 1355, 1360.
¶ 22 We have reviewed the record in its entirety. T.D. has lived with his Father, Father's wife, and his two half-brothers for three years. He has healed and thrived in that environment. DHS, an independent psychologist, and T.D.'s attorneys all agree that T.D. should remain in Father's care. There is nothing in the record to suggest that T.D.'s placement with Father is not in his best interest. The trial court properly placed T.D. with Father.

CONCLUSION
¶ 23 The issues raised by Mother on appeal are without merit. However, the trial court must insure that Mother's agreement to relinquish her parental rights in T.D. was voluntary and made with full knowledge of the affects of that relinquishment. In so doing, the trial court must enter a finding of fact in accord with the spirit of 10 O.S. Supp.2000 § 7503-2.3 or, in the alternative, terminate Mother's rights involuntarily pursuant to 10 O.S. Supp.2000 § 7006-1.1. Accordingly, we reverse the portion of the trial court's order terminating Mother's parental rights and remand for further limited proceedings in accord with this opinion.
¶ 24 REVERSED AND REMANDED.
¶ 25 REIF, V.C.J., concurs, and GOODMAN, P.J., dissents.
GOODMAN, P.J., dissenting:
¶ 1 I would not permit mediation of a non-voluntary proceeding by the State to terminate the rights of a parent to a child.
NOTES
[1] The petition also sought the adjudication of LaTray's biological son, but that child's status and custody are not at issue here.
[2] According to Dr. Baumann's recitation of T.D.'s records, Mother left Father in Arkansas and moved to Oklahoma with T.D. when T.D. was approximately 8 months old. Father was unable to locate them until T.D. was approximately 3 years old. At that point, Father had to establish his paternity through DNA tests, since Mother had claimed that T.D.'s biological father was deceased and collected Social Security benefits on T.D.'s behalf.
[3] T.D.'s attorney has moved to dismiss Mother's appeal based on her failure to timely file the designation of record with the district court. Okla.Sup.Ct.R. 1.28(b)(3) provides that, in deprived child appeals, the appellant shall file the designation of record with the district court within ten days of the date of the order from which she appeals. Mother filed her designation of record approximately one month from the date of the district court's order. Although Mother's appeal could be dismissed on that ground alone, we decline to do so because of the importance of the issues involved here.
[4] Indeed, the record on appeal contains no evidence regarding Father's arrest, although Father admits in his brief on appeal that his arrest was for the possession of marijuana and resulted in a misdemeanor charge and a fine. As for Mother's assertion that Father had a duty to disclose his arrest during the mediation, we, like Appellees, are at a loss to understand how Father could have had a duty to disclose an unknown future event.
[5] This also raises the question of Father's place in this proceeding. Although he is obviously an interested person, he is not a party to this proceeding by the State against Mother. Yet it appears that Father is a party to the mediation agreement, since he agreed to release the claims for child support.