IN the INTEREST OF BABY GIRL K., a person under the age of 18:

L.K., Petitioner-Respondent,

v.

B.B., Respondent-Appellant-Petitioner.

Supreme Court

*No. 82–087. Argued April 27, 1983.—Decided July 1, 1983.*

(Also reported in 335 N.W.2d 846.)

For the petitioner there were briefs by *Gerhardt F. Getzin* and *Getzin & Janetta,* Wausau, and oral argument by *Gerhardt F. Getzin.*

For the petitioner-respondent there was a brief by *Patrick M. Brady* and *Bradley, Hoover & Brady, S.C.,* Wausau, and oral argument by *Patrick M. Brady.*

There was oral argument by *James Kurth,* Wausau, guardian ad litem.

DAY, J.  This is a review of an unpublished decision of the court of appeals which affirmed a judgment of the Circuit Court for Marathon County, Leo D. Crooks, Judge, terminating the parental rights of the father, B.B., to Baby Girl K. under the provisions of sec. 48.415(6)(a)2 and 6(b),[1] Stats. 1981–82.

There are four issues presented on review.  The first issue is: Does sec. 48.415(6)(a)2 permit termination of the parental rights of a father of a child born out of wedlock where the father was incarcerated in the state prison system from the fifth month of the mother's pregnancy?

---

[1] Section 48.415(6)(a)2 and 6(b), Stats., 1981–82 reads:

"**Grounds for involuntary termination of parental rights.**  At the fact-finding hearing the court may make a finding that grounds exist for the termination of parental rights.  Grounds for termination of parental rights shall be one of the following: . . .

"(6) FAILURE TO ASSUME PARENTAL RESPONSIBILITY.  (a) Failure to assume parental responsibility may be established by a showing that a child has been born out of wedlock, not subsequently legitimated or adopted, that paternity was not adjudicated prior to the filing of the petition for termination of parental rights and: . . .

"(2) That although paternity to the child has been adjudicated under s. 48.423, the father did not establish a substantial parental relationship with the child prior to the adjudication of paternity although the father had reason to believe that he was the father of the child and had an opportunity to establish a substantial parental relationship with the child.

"(b) In this subsection, 'substantial parental relationship' means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child.  In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has ever expressed concern for or interest in the support, care or well-being of the child or the mother during her pregnancy and whether the person has neglected or refused to provide care or support even though the person had the opportunity and ability to do so."

The second issue is: Was the termination of B.B.'s parental rights under the provisions of sec. 48.415(6)(a)2, Stats., properly ordered here?

The third issue is: Must a specific finding of parental unfitness be made in order to involuntarily terminate parental rights under sec. 48.415(6)(a)2, Stats.?

The final issue is: Does sec. 48.415(6), Stats., violate the Equal Protection Clause of the Fourteenth Amendment?

We conclude that the mere fact that the father of the child born out of wedlock has been incarcerated in the prison system since the fifth month of the mother's pregnancy does not preclude possible termination of his parental rights under sec. 48.415(6)(a)2, Stats. We also conclude that due process does not require a finding of parental unfitness where the father has failed to establish a substantial parental relationship under sec. 48.415 (6)(a)2. We determine that the trial court properly terminated B.B.'s parental rights under sec. 48.415(6) (a)2.

Finally, we conclude that sec. 48.415(6)(b)2, Stats., does not violate the Equal Protection Clause of the Fourteenth Amendment.

Accordingly, we affirm the decision of the court of appeals.

L.K., Baby Girl K.'s mother, and B.B. began dating in July, 1979. At that time and up through to the birth of Baby Girl K. on March 17, 1981, L.K. was a minor.

In June, 1980, L.K. became pregnant with Baby Girl K. Approximately five months later, in November, 1980, B.B. was convicted of burglary and incarcerated at the Kettle Morraine Correctional Institute. A prior conviction occurred in 1977 when he was convicted of burglary and sent to the Wisconsin State Reformatory.

From June until November, 1980, B.B. continued seeing L.K. According to the testimony of L.K., B.B. did

not work but apparently supported himself quite well by dealing in drugs and "robbing places."[2] During that period of her pregnancy, L.K. stated that B.B. treated her "fairly good" but she recalled an incident where "he picked up my bike and threw it into the road from the porch, and then . . . grabbed me around the neck and tried to strangle me." L.K. also testified that B.B. would use the money from his drug dealing and robberies to "go out to bars and . . . buy drinks for everyone" and to buy marijuana. She noted that "he smoked a fair amount of his money away."

Prior to his incarceration, B.B. did not contribute to defraying the cost of any of L.K.'s pregnancy related expenses although he did pay some of her dental expenses.[3] After his incarceration, B.B. also made no contribution to her expenses. However, L.K. testified that she told him not to worry about the expenses while he was in prison. She also testified that B.B. suggested that she and the child go live with his mother after the baby was born.

While in prison, prior to the birth of Baby Girl K. B.B. and L.K. corresponded. In his letters, B.B. twice requested that L.K. come visit him and try to smuggle some marijuana to him. B.B.'s letters also expressed the concern if L.K. gave up the baby for adoption, that might end their relationship.[4]

[2] L.K.'s testimony as to these acts was admitted at trial not to prove the commission of the acts but for the purpose of showing that B.B. had funds to support L.K. during this period.

[3] L.K. testified on cross-examination that she asked B.B. prior to his incarceration for help in paying her expenses and in fact had her first doctor bill sent to his house. After the bill went unpaid, it was redirected to L.K.'s parents' house for payment.

[4] B.B.'s January 26, 1981, letter to L.K. (Exhibit 1 in the record) shows this concern: "I feel that if you do give our baby away that you'll be out fucking guys and you'll forget about me . . . I worry alot about guys going after your ass . . . ."

Before Baby Girl K.'s birth, B.B. apparently initially consented to having his parental rights terminated. However, as L.K. testified on cross-examination, he changed his mind "right around the time I stopped writing him." It was L.K.'s belief that B.B. wanted the child in order to perpetuate a relationship with her. The record and B.B.'s correspondence with L.K. lend credence to her statement.

B.B. points out that he offered to have L.K. and the child live with his mother and stepfather. L.K. refused that offer. A social worker's report which was ordered by the trial court following B.B.'s request for an evaluation of his parents' home showed that B.B. had been removed from that household and placed in a foster home and that later a half-sister had likewise been taken out of the household and placed in a foster home.[5]

On March 17, 1981, Baby Girl K. was born. L.K. signed a Voluntary Placement Agreement with the Marathon County Department of Social Services (Department) on March 18, 1981. The purpose of the agreement was to allow Baby Girl K. to be placed in a foster home upon her discharge from the hospital. The placement occurred on March 20, 1981. Baby Girl K. has remained in the same foster home since that date. The foster parents have expressed an interest in adopting her should the parents' rights be terminated.

---

[5] The report of the social worker from the Marathon County Department of Social Services dated November 19, 1981, and filed with the Court November 24, 1981, shows that B.B. was born June 14, 1958. He was one of three children born to his mother in her first marriage. His parents were divorced in January of 1961. The mother married J.H. later that year and two children were born to them. The social worker's report shows that the department provided social services periodically from the time of the breakup of the first marriage. In 1975 B.B. was placed "in substitute care" because of B.B.'s "disruptive behavior." When B.B. became eighteen the case was closed. A daughter from the second marriage was placed in "substitute care" in 1976. That case was apparently closed when the girl became eighteen in 1980.

L.K. initially filed a petition for voluntary termination of parental rights but withdrew it after learning that B.B. would not consent to having his parental rights terminated. B.B. had filed a Declaration of Parental Interest with the Department on April 13, 1981. In June, 1981, L.K. filed a petition requesting that Baby Girl K. be found in need of protection or services and that her custody be transferred to the Department for the purpose of continued foster care placement ("Chips" petition).

On August 3, 1981, B.B. filed a petition for a determination of paternity and custody, and a motion to consolidate these matters with the "Chips" proceeding. Subsequently, L.K. filed a petition for the termination of B.B.'s parental rights under sec. 48.415(6), Stats. All of these actions were consolidated.

On December 23, 1981, the trial court adjudged B.B. the father of Baby Girl K. The court then held a hearing on L.K.'s petition to terminate the parental rights of B.B. The testimony set out above was given at this hearing. In addition, at the hearing, Baby Girl K.'s guardian ad litem recommended that B.B.'s parental rights be terminated.

Following the hearing, in a decision from the bench, the trial judge ordered B.B.'s parental rights terminated. The court determined that B.B. had "failed to assume parental responsibility as set forth and defined in sec. 48.415(6)(a)2 and subsection (6)(b)," Stats. In so deciding, the court stated:

"This Court does find that preliminary to his incarceration Mr. [B.B.] was able to provide care and support and failed to do so. This record fails to show that Mr. [B.B.], in any way, attempted to carry on a meaningful relationship which this Court could consider as a substantial parental relationship, even by mail, or by phone, or in any other manner, doing those things that are essential to a substantial parental relationship: expressing concern with small gifts, a card, request that the baby be

brought down for a visit, any number of little things that spell the difference between the results of a sexual encounter or a parent-child relationship.

"This Court does believe that in spite of his incarceration Mr. [B.B.] had that opportunity to establish a substantial parental relationship. The legislature has not given us guidelines where they will decide or where they have decided, that 'X' number of weeks or months or years constitutes the failure to establish that parental relationship and it is true that Mr. [B.B.] did file the Declaration of Parental Interest as set forth in Exhibit 4. There is no doubt in my mind that he is interested. But, he has failed to carry through on those areas that are essential to establish a substantial parental relationship."

The trial court also made the following written findings of fact and conclusions of law which are pertinent:

## "FINDINGS OF FACT

"7. That during the period that petitioner was pregnant with Baby Girl [K.], the respondent, [B.B.], on two occasions, wrote letters to petitioner asking her to smuggle marijuana into the Kettle Moraine Correctional Facility for his personal use.

"8. That on one occasion during the period that petitioner was pregnant with Baby Girl [K.] the respondent, [B.B.], physically assaulted petitioner.

"9. That the respondent, [B.B.], neglected to provide care or support to petitioner during her pregnancy even though respondent, [B.B.], had the opportunity and ability to do so.

"10. That respondent, [B.B.], failed to present evidence of any attempts on his part to establish a parental relationship with Baby Girl [K.] such as attempts to contact said child, write to persons caring for said child or to send the child cards or gifts.

11. That respondent, [B.B.], failed to make any attempt to contribute towards the medical expenses of petitioner occasioned by her pregnancy and the subsequent delivery of Baby Girl [K.].

"12. That there is a high degree of likelihood that Baby Girl [K.] will be adopted in the event the parental rights of [B.B.] are terminated.

"13. That Baby Girl [K.] is in good health and at the time of placement of foster care, was only three (3) days old.

"14. That the child has had no relationship with either parent or other family members so that it would not be harmful to said child to sever such relationships.

"15. That in the event the parental rights of [B.B.] are terminated, that the child will be able to enter into a more stable and permanent family relationship.

*"CONCLUSIONS OF LAW . . .*

"16. That respondent, [B.B.], has failed to assume parental responsibility for Baby Girl [K.] within the meaning of Sec. 48.415(6), Wis. Stats.

"17. That it is in the best interest of Baby Girl [K.] that the parental rights of her father, [B.B.], be terminated."

B.B. appealed from the judgment. The court of appeals affirmed. That court concluded that the evidence was sufficient to support a finding that B.B. had an opportunity to develop a substantial relationship with Baby Girl K. and had failed to do so. The court of appeals determined that the trial court's finding that the termination of B.B.'s parental rights would be in the best interest of Baby Girl K. was not against the great weight and clear preponderance of the evidence. The court also concluded that a specific finding of parental unfitness was unnecessary to terminate B.B.'s parental rights. However, the court went on to note that even though a finding of unfitness was not required, such a finding "is clearly sustained by the record." Finally, the court held that sec. 48.415(6)(a)2 did not unconstitutionally deny B.B. the equal protection of the law.

The first issue on review is: Does sec. 48.415(6)(a)2, Stats., permit the termination of the parental rights of a father of a child born out of wedlock where the father was incarcerated in the Wisconsin prison system from the fifth month of the mother's pregnancy?

Section 48.415(6)(a)2, Stats., allows the parental rights of a father whose paternity has been adjudicated to be terminated under certain conditions. The conditions exist where a father has not established a substantial parental relationship prior to the adjudication of paternity even though he had reason to believe he was the father of the child and had an opportunity to establish such a relationship. The question here is did B.B. have an opportunity to establish a relationship with Baby Girl K.

In evaluating whether a substantial parental relationship exists, the legislature in sec. 48.415(6)(a)2, Stats., authorized trial courts to consider the father's behavior during the pregnancy of the mother. Specifically, sec. 48.415(6)(a)2 allows a court to consider whether the father "has ever expressed concern for or interest in the support, care or well-being of the child or mother during her pregnancy and whether the person has neglected or refused to provide care and support even though the person had the opportunity to do so." It is clear therefore that the legislature intended that a father's pre-delivery behavior be a consideration in determining whether the father had established a substantial parental relationship.

May a father's action prior to the birth of his child form a sufficient basis to conclude that he had an "opportunity" to establish a substantial parental relationship with the child? We hold that it may.

In sec. 48.415(6)(b) the legislature defined "substantial parental relationship" as "the acceptance and

exercise of significant responsibility for the daily super-vision, education, *protection and car*e of the child."
(Emphasis added.) Medical authorities have long rec-ognized that prenatal care is important to the eventual health and well-being of an infant.[6] Because what hap-pens to a fetus in utero can have a significant impact upon the quality of life a child will have after birth, we conclude that a parent's action prior to a child's birth can form a sufficient basis for determining whether that parent has established a substantial parental relation-ship with the child.

The parental rights of fathers of children born out of wedlock have been given constitutional protection. *Stan-ley v. Illinois,* 405 U.S. 645, 658 (1972). If the statute foreclosed the possibility of a father showing he had developed a substantial parental relationship with his child, due process would be violated. Here however, that possibility is not foreclosed. The father's parental rights must be continued absent a showing that he has failed to establish a substantial parental relationship.

The opportunity to exercise responsibility for the care and protection of a child begins before the child's birth. A statute such as this one which allows consideration of the father's conduct before the birth of the child recog-nizes that fact.

We conclude that the mere fact that the father of a child born out of wedlock has been incarcerated in the prison system since the fifth month of the mother's pregnancy does not preclude possible termination of his parental rights under sec. 48.415(6)(a)2, Stats.

Concluding that sec. 48.415(6)(a)2 allows a trial court to terminate the parental rights of a father in a situa-

---

[6] 4B G. Gray, *Attorneys' Textbook of Medicine,* secs. 305.10, 305.-11 (3 ed. 1983); 5B *Lawyers' Medical Cyclopedia,* sec. 37.5a (C. Frankel ed. 1972).

tion like the one here, we now turn to the second issue before this Court on review: Was the trial court's decision terminating B.B.'s parental rights under the provisions of sec. 48.415 (6) (a) 2, Stats., proper? We conclude it was.

The trial court determined that B.B. had "failed to assume parental responsibility for Baby Girl [K.] within the meaning of sec. 48.415 (b)." As the basis for this conclusion, the court in its findings of fact noted that: 1) B.B. had asked L.K. on two occasions to smuggle marijuana to him in prison, 2) had physically assaulted L.K. while she was pregnant, 3) B.B. had neglected to provide care or support to L.K. during the pregnancy even though he had the opportunity and ability to do so, 4) had failed to present any evidence of attempts on his part to contact the child, write to persons caring for her or to send cards or gifts, and 5) B.B. had failed to contribute toward L.K.'s medical expenses arising from the pregnancy and delivery of Baby Girl K.

A trial court's finding of fact will not be set aside unless against the great weight and clear preponderance of the evidence.[7] A review of the record here convinces us that the findings here were correct. Each finding is supported by clear and convincing evidence in the record.

L.K. established a *prima facie* case for the termination of B.B.'s parental rights under the statute. Because such a case had been established, the burden shifted and it became necessary for B.B. to present evidence that he had established a substantial parental relationship with Baby Girl K. This he completely failed to do. Although he attended the trial, he presented no testimony whatso-

---

[7] *Onalaska Electrical Heating, Inc. v. Schaller,* 94 Wis. 2d 493, 501, 288 N.W.2d 829 (1980); *Cogswell v. Robertshaw Controls Co.,* 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979); *Bank of Sun Prairie v. Opstein,* 86 Wis. 2d 669, 676, 273 N.W.2d 279 (1979); *Gehr v. Sheboygan,* 81 Wis. 2d 117, 122, 260 N.W.2d 30 (1977); *Gerner v. Vasby,* 75 Wis. 2d 660, 662–664, 250 N.W.2d 319 (1977).

ever on his behalf and, with the exception of his Declaration of Parental Interest, no evidence on the termination question.

Based upon its findings of fact, the trial court concluded that B.B.'s parental rights should be terminated under sec. 48.415(6)(a)2. The trial court also concluded that the termination would be in the best interest of Baby Girl K.

In order for parental rights to be terminated, the petitioner must show by clear and convincing evidence that the termination is appropriate. This burden of proof is required both by sec. 48.31, Stats. 1981–82, and by the due process clause, *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S. Ct. 1388, 1402–1403 (1982).

We conclude that the petitioner here met this burden. The findings of fact as set out by the trial court provide clear and convincing evidence that B.B. had failed to establish a substantial parental relationship with Baby Girl K. and that termination of B.B.'s parental rights was in the child's best interest.

B.B. showed a blatant disregard for both mother and child when he asked L.K. to smuggle marijuana into prison for his use. If L.K. had acquiesed to his request and been apprehended, she would have faced the possibility of a prison term.[8] Further, B.B.'s physical assault of L.K. certainly shows no concern for the care or well-being of either mother or child. In addition, the testimony of the guardian ad litem supported termination.

The law is made to try and cope with the ever increasing number of illegitimate births and to alleviate the increasing burden to society that such households often present; ever growing relief rolls, and the bleak future the children face living at a near poverty level. It is for these reasons among others that when the single mother is willing to allow her child to be adopted

---

[8] Section 161.465(1), Stats. 1981–82.

whatever right such a child's father may have must be resolved in a manner that looks out for the child's best interest and at the same time protects the rights of the father. It is for this reason that examining his attitude and relationship to the unborn child and its mother makes common sense. Short of abortion, the pregnant mother can't escape responsibility. But the putative father's relationship is voluntary.

After the child is born his relationship to the child is also indicative of whether a substantial relationship has been established with the child. A court cannot ignore the circumstances of why this father was not physically available from the fifth month of pregnancy. He was convicted and sentenced for burglary. This was not a case of being absent because of illness, military service or the demands of a job. His absence was due to incarceration from the wilful act of burglary. It was his second incarceration for that crime.

B.B.'s parental rights were properly terminated under the provisions of sec. 48.415 (6) (a) 2, Stats.

The third issue on review is: Must a specific finding of parental unfitness be made in order to involuntarily terminate parental rights under sec. 48.415 (6) (a) 2, Stats. ?

Even though sufficient findings have been made so that B.B.'s parental rights may be terminated under the statute, a question remains as to whether such a termination may be accomplished without a finding of unfitness.

In *Stanley,* the United States Supreme Court held that before the parental rights of an unwed father could be terminated that person was constitutionally entitled to a hearing on his fitness as a parent. 405 U.S. at 658. In *Santosky,* the Supreme Court noted that, "the fundamental liberty interest of natural parents in the care,

custody and management of their child does not evaporate simply because they have not been model parents," 455 U.S. at 753, and because of this interest held that termination could only take place where there was clear and convincing evidence it was appropriate. *Id.* at 769.

This court, in *In the Interest of J.L.W.*, 102 Wis. 2d 118, 306 N.W.2d 46 (1981), held that "the due process protections of both the state and federal constitutions prohibit the termination of natural parent's rights, unless the parent is unfit." In *J.L.W.*, because no finding was made that the natural mother was an unfit parent and because such a finding could not be sustained by the record, this Court reversed the order and judgment of the trial court terminating the natural mother's rights and returned the child to the mother.

Both *Stanley* and *J.L.W.* involved natural parents who had at some point in their children's lives participated in raising them. However commentators have suggested that the failure of a parent to participate at all in raising of the child may eliminate the constitutional requirements for a finding of unfitness.[9]  We agree.

The recent United States Supreme Court case of *Lehr v. Robertson*, —— U.S. —— (Case No. 81–1756, decided June 27, 1983) supports this position.[10]  In *Lehr*, the

[9] S. Hayes and M. Morse, *Adoption and Termination Proceedings in Wisconsin: Straining the Wisdom of Solomon*, 66 Mq. L. Rev. 439, 452, 475 (1983); See *Lehr v. Robertson*, —— U.S. ——, (Case No. 81–1756, decided June 27, 1983), Slip op. p. 13, footnote 17.

[10] Justice Stevens stated that the questions the United States Supreme Court had jurisdiction to consider on *review* were "whether the New York Statutes are unconstitutional because they inadequately protect the natural relationship between parent and child or because they draw an impermissible distinction between the rights of the mother and the rights of the father." *Lehr*, Slip op., p. 7, fn. 10.

On the latter issue, the father contended "that the gender-based classification in the statute, which denied him the right to con-

Court determined that the rights enjoyed by the natural fathers of children born out of wedlock did not acquire constitutional protection under the due process clause until "the unwed father demonstrates a full commitment to the responsibilities of parenthood by 'coming forward to participate in the rearing of his child.'" Slip op., p. 12, quoting *Caban v. Mohammed*, 441 U.S. 380, 392 (1979). The Court went on to add that "the mere existence of a biological link does not merit equivalent constitutional protection." Slip op., p. 12.

In *Lehr*, the United States Supreme Court determined that the father of a child born out of wedlock who had lived with the mother of the child up to the time of the child's birth and who had seen the child occasionally after the birth,[11] had no due process right to be notified

sent to [his daughter's] adoption and accorded him fewer procedural rights than her mother, violated the Equal Protection Clause." *Id.*

[11] According to Justice White in his dissent in *Lehr*, the fact that the father only occasionally saw the child after her birth was the direct result of the mother's attempts to conceal her whereabouts from the father. As Justice White states the facts:

"According to Lehr, [the father], he and Jessica's mother met in 1971 and began living together in 1974. The couple cohabited for approximately 2 years, until Jessica's birth in 1976. Throughout the pregnancy and after the birth, Lorraine [the mother] acknowledged to friends and relatives that Lehr was Jessica's father; Lorraine told Lehr that she had reported to the New York State Department of Social Services that he was the father. (Footnote omitted.) Lehr visited Lorraine and Jessica in the hospital every day during Lorraine's confinement. According to Lehr, from the time Lorraine was discharged from the hospital until August, 1978, she concealed her whereabouts from him. During this time Lehr never ceased his efforts to locate Lorraine and Jessica and achieved sporadic success until August, 1977, after which time he was unable to locate them at all. On those occasions when he did determine Lorraine's location, he visited with her and her children to the extent she was willing to permit it. When Lehr, with the aid of a detective agency, located Lorraine and Jessica in August, 1978, Lorraine was already married to Mr. Robertson. Lehr as-

of the impending adoption of the child. Essential to this holding was a determination that the father, lacking a substantial parental relationship with the child, had no constitutionally protected interest in his relationship with the child which would be offended by his failure to be notified of the adoption proceedings.

The United States Supreme Court in *Lehr,* noting that there is a "clear distinction between a mere biological relationship and an actual relationship of parental responsibility," quoted with approval a statement by Justice Stewart in *Caban:*

"Even if it be asumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship, cf. *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–863 (opinion concurring in judgment), it by no means follows that each unwed parent has any such right. *Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.*" 441 U.S., at 397, (emphasis in original) slip op., pp. 10–11).

The United States Supreme Court then further said in the footnote following:

"In the balance of that paragraph Justice Stewart noted that the relationship between a father and his natural child may acquire constitutional protection if the father enters into a traditional marriage with the mother or if *'the actual relationship between father and child'* is *sufficient.*

serts that at this time he offered to provide financial assistance and to set up a trust fund for Jessica, but that Lorraine refused. Lorraine threatened Lehr with arrest unless he stayed away and refused to permit him to see Jessica. Thereafter Lehr retained counsel who wrote to Lorraine in early December, 1978, requesting that she permit Lehr to visit Jessica and threatening legal action on Lehr's behalf. On December 21, 1978, perhaps as a response to Lehr's threatened legal action, appellees commenced the adoption action at issue here." *Lehr,* (White, J., dissenting) slip op., pp. 2–3.

" 'The mother carries and bears the child, and in this sense her parental relationship is clear. The validity of the father's parental claims must be gauged by other measures. By tradition, the primary measure has been the legitimate familial relationship he creates with the child by marriage with the mother. By definition, the question before us can arise only when no such marriage has taken place. In some circumstances the actual relationship between father and child may suffice to create in the unwed father parental interests comparable to those of the married father. Cf. *Stanley v. Illinois*, *supra*. But here we are concerned with the rights the unwed father may have when his wishes and those of the mother are in conflict, and the child's best interests are served by a resolution in favor of the mother. It seems to me that the absence of a legal tie with the mother may in such circumstances appropriately place a limit on whatever substantive constitutional claims might otherwise exist by virtue of the father's actual relationship with the children.' " *Lehr* fn. 16, slip op., pp. 11–13 quoting *Caban*, 441 U.S. at 397. (Stewart, J. dissenting.) (Emphasis added.)

Although in *J.L.W.*, this court suggested that due process might require a finding of unfitness before any natural parent's parental rights are terminated, the specific holding related only to a parent who had physical custody of the child for the first four months of the child's life and whose every action "from the time she learned of her pregnancy showed a concern for the child she was to bear." *J.L.W.*, 102 Wis. 2d at 137. Unlike Lehr, *J.L.W.* was a case where the parent had already "demonstrated a full commitment to the responsibilities of parenthood." *Lehr*, slip op., p. 12. Thus, this court's holding in *J.L.W.* does not require that a finding of parental unfitness be made where the father has failed to establish a parental relationship with the child.

In this case, the trial court found by clear and convincing evidence that B.B.'s parental rights should be terminated because he had the opportunity but failed to

establish a substantial parental relationship with Baby Girl K. We agreed with this determination. B.B.'s failure to establish a substantial parental relationship under the statute is the equivalent of a failure to "demonstrate a full commitment to the responsibilities of parenthood by 'coming forward to participate in the rearing of the child.' " *Lehr*, slip op., p. 12.

A natural father's interest in personal contact with his child is protected under the due process clause because of this society's belief in the protection of the familial relationship. *Lehr*, slip op., p. 12. The significance of this relationship " 'to the individuals involved and to society, stems from the emotional attachments that derive from the intimacy of *daily association*, and from the role it plays in 'promot[ing] a way of life' through the instruction of children as well as from the fact of blood relationship.' " *Id.*, quoting *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 844 (1977) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 (1972)) (emphasis added).

Here, although in prison, B.B. had the opportunity to establish a substantial parental relationship with Baby Girl K. Instead of offering care and support to the mother and child, he did the opposite and proceeded along a path which jeopardized not only his own future but that of the mother and child. Although B.B. did not have an opportunity for "daily association" with his child, that opportunity was lost because of his own doing. We cannot ignore this fact nor the fact that B.B. on at least one occasion attempted to strangle the mother of his child.

Where a father shows so little care, support or concern for the well-being of his child that his parental rights may be terminated under sec. 48.415(6)(a)2, that failure to establish a substantial parental relation-

ship with the child means that the father's interest in contact with his child does not warrant protection under the due process clause of the constitution. Due process does not require a finding of parental unfitness before a father's parental rights may be terminated under sec. 48.415(6)(a)2.

The final issue on review is: Does sec. 48.415(6)(a)2, Stats., violate the equal protection clause?

This issue was raised for the first time on appeal. The court of appeals considered this question and concluded that this statute did not deny B.B. the equal protection of the law.

Consideration of a constitutional issue raised for the first time on appeal is discretionary with this court and will be done if "it is in the best interests of justice to do so, if both parties have had the opportunity to brief the issue and if there are no factual issues that need resolution." *Laufenberg v. Cosmetology Examining Bd.*, 87 Wis. 2d 175, 187, 274 N.W.2d 618 (1979); *State v. Yellow Freight System, Inc.*, 101 Wis. 2d 142, 158, 303 N.W.2d 834 (1981). In this case, these requirements are met. Further, the court of appeals had the opportunity to examine this issue and render an opinion on the question. We therefore will exercise our discretion to consider the issue.

Where a statute discriminates on its face between males and females, it is subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *Mississippi University for Women v. Hogan,* —— U.S. ——, slip op., p. 5 (July 1, 1982). For a statute which discriminates on the basis of gender to be upheld, there must be a showing that it "serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achivement of those objectives.' " *Hogan,* slip op., pp. 5–6 quoting

*Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 150 (1980). This test must be applied "free of fixed notions concerning the roles and abilities of males and females." *Hogan,* slip op., p. 6. However, where a statute draws a distinction between classes where all the members of one class possess a characteristic not possessed by all the members of the other class, the fact that the distinction is "gender-based" should not give rise to a presumption that the Equal Protection Clause has been violated. *Caban v. Mohammed,* 441 U.S. 380, 409–410 (1979) (Stevens, J., dissenting).

The majority in *Caban* held that a New York statute which gave the mother of children born out of wedlock, but not the father of such children, veto power over the adoption of the children violated the Equal Protection Clause of the Fourteenth Amendment. In *Caban,* the children involved were four and six years old at the time of the adoption proceeding. The father had lived with the mother and children as a "natural family" for several years prior to the proceeding. 441 U.S. at 389.

Although rejecting the contention that unwed fathers necessarily have less of a relationship with their children then do unwed mothers, the Court noted that where newborn infants were concerned, the differences between unwed mothers as a class and unwed fathers might form a basis for a valid gender-based distinction regarding adoption proceedings. 441 U.S. at 389.

In his dissent in *Caban,* Justice Stevens recognized this exception. He noted that from conception, "on through pregnancy and infancy, the differences between the male and female have an important impact on the child's destiny." 441 U.S. at 404. We agree. During pregnancy, the biological makeup of the mother insures that she will provide care and support for the child forming within her. She cannot help but accept and exercise significant responsibility for the protection and

care of the child because her own welfare is tied intimately to the child's.

The purpose of sec. 48.415(6)(a)2 is to promote the best interest of a child while insuring that the rights of a father who has established a substantial parental relationship with the child will not be terminated. Both the state and the unwed mother may have substantial interests in terminating the parental rights of a father who had no substantial relationship with the child. The statute gives fathers incentive to provide care and support for the mother and child during pregnancy and infancy. Further, it allows for a prompt determination of the status of the child so that, if desired, the child might be adopted into a family that wants a child.

The statute as applied in this case is not based upon fixed notions of what the "proper" roles of males and females should be. The United States Supreme Court in *Lehr* recognized that "the existence or non-existence of a substantial relationship is a relevant criterion in evaluating both the rights of the parents and the best interests of the child." Slip op., p. 18. The statute here is based upon a recognition that for women biology dictates that they provide care and support for a child during pregnancy. For men however, that care and support must be voluntarily given. Men may or may not accept and exercise significant responsibility for the care and protection of the child during pregnancy; women have it thrust upon them. For men, failure to establish a substantial parental relationship after a child is born is the equivalent of a married father abandoning or neglecting his child which can be the basis for a finding of unfitness. And, as the United States Supreme Court in *Lehr* noted, "if the father had not 'come forward to participate in the rearing of his child, nothing in the Equal Protection Clause [would] preclude [] the State from withholding from him the privilege of vetoing the adop-

tion of that child.'" Slip op., p. 19. Here, while termination of parental rights rather than the availability of a veto over the child's adoption is at issue, the equal protection question is substantially the same.

The statute as applied here does not violate the Equal Protection Clause of the Fourteenth Amendment.

We agree with the trial court and the court of appeals that the record here amply supports termination of B.B.'s parental rights.[12]

*By the Court.*—Decision of the court of appeals is affirmed.

BEILFUSS, C.J. (*dissenting*). The majority affirms the trial court's termination of B.B.'s parental rights, holding that the statutory grounds for involuntary termination were met and that due process does not require a finding of parental unfitness before termination. Because the record before this court does not support the holding that the statutory grounds were met, and because I believe due process requires a finding of unfitness before B.B.'s rights can be terminated, I dissent.

The majority glosses over the nature of the interest at stake in an involuntary termination hearing. Therefore I must start with an examination of the nature of B.B.'s rights which must be accorded before termination. The relationship between parent and child is protected by the Due Process Clauses of the state and federal constitutions. *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978); *In Interest of J.L.W.,* 102 Wis. 2d 118, 136, 306 N.W.2d 46 (1981). Both this court and the United States Su-

[12] The statement by Justice Abrahamson in footnote 1 of her dissent alleging that "the majority treats termination of parental rights like a punishment for a crime, thus increasing the legislatively prescribed penalties for commission of a crime by adding a new penalty, loss of a child" is an unwarranted conclusion and is simply incorrect.

preme Court have consistently recognized the firmly established principle that natural parents have a fundamental liberty interest in the care, custody and management of their children. *Santosky v. Kramer,* 455 U.S. 745 (1982), and cases cited therein; *In Interest of D.L.S.,* 112 Wis. 2d 180, 332 N.W.2d 293 (1983) ; *Termination of Parental Rights of T.R.M.,* 100 Wis. 2d 681, 303 N.W.2d 581 (1981). The right to conceive and raise one's own child has been described as essential, one of our basic civil rights and more precious than property rights. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972).

The fundamental nature of this right is not affected by the fact that the child was born without the benefit of a marriage ceremony between the parents. The United States Supreme Court in recent decisions has made it clear that the parental rights of putative fathers are also entitled to constitutional protection. *Caban v. Mohammed,* 441 U.S. 380 (1979) ; *Quilloin v. Walcott,* 434 U.S. 246 (1978) ; *Stanley v. Illinois,* 405 U.S. 645 (1972). While the United States Supreme Court has recently indicated that unwed fathers who have an opportunity to develop a parental relationship and fail to do so may not always be entitled to the same due process protections as other parents, *Lehr v. Robertson,* —— U.S. —— (June 27, 1983), this court has expressly recognized "that the bond of nature between a parent and a child born out of wedlock *should not be less protected by the law* 'simply because her natural father has not married her mother.' " *State ex rel. Lewis v. Lutheran Social Services,* 59 Wis. 2d 1, 12, 207 N.W.2d 826 (1973), quoting *Gomez v. Perez,* 409 U.S. 535 (1973), (emphasis supplied). Further, in *In Interest of J.L.W.,* 102 Wis. 2d 118, 306 N.W. 2d 46 (1981), this court recognized that the parental rights of unmarried parents are entitled to protection under the due process clause of the state constitution. Thus I believe that B.B. has a fundamental parental right as to his daughter, Baby Girl K.

This fundamental right to raise one's own child is not absolute, but is qualified by the *parens patriae* power of the state to protect the best interests of children, which in some circumstances requires termination of parental rights. But because the termination of parental rights "implicates the fundamental rights of a parent" such rights "must be accorded a high order of respect and must be considered paramount until circumstances show that the parent has forfeited these rights." *Termination of Parental Rights to T.R.M.,* 100 Wis. 2d at 689. Therefore the procedure that must be followed in terminating parental rights is necessarily rigorous.

The procedure in Wisconsin for involuntarily terminating is threefold: the statutory grounds must be satisfied, sec. 48.415; except in unusual circumstances the parent must be found unfit; and the termination must be in the child's best interests. *In Interest of J.L.W.,* 102 Wis. 2d 118, 306 N.W.2d 46 (1981). Further, as recognized by the majority, due process and Wisconsin statutes require that the party seeking termination show by clear and convincing evidence that termination is appropriate. Sec. 48.31, Stats. 1979–80; *Santosky v. Kramer,* 455 U.S. 745 (1982).

My review of the record leads me to the conclusion that neither the statutory grounds nor the requirement of unfitness were satisfied.[1] I address first the majority's holding that the statutory grounds for termination were met. Sec. 48.415(6)(a)2, Stats., allows for termination of an unwed father's parental rights if he does not establish a "substantial parental relationship" with his child prior to adjudication of paternity. This statute explicitly directs considerations of the father's conduct toward both the mother and the child from conception through the paternity determination.

[1] B.B. does not challenge the trial court's finding that termination would promote Baby Girl K.'s best interests and that issue is not before the court.

Contrary to the language of the statute, the majority relies solely on B.B.'s actions during L.K.'s pregnancy to affirm the trial court's finding that the statutory grounds were met and ignores his conduct during the nine months between Baby Girl K.'s birth and the adjudication of paternity. Even assuming that B.B.'s conduct during L.K.'s pregnancy showed a complete disregard for the health and welfare of the unborn child and the mother (which the record does not support), there is evidence in the record that immediately after Baby Girl K.'s birth B.B. consistently demonstrated, through the legal process and correspondence with the trial court, foster parents and Marathon County Department of Social Services, his interest and concern for his daughter and his desire to raise her after his release from criminal confinement. The majority completely ignores the first nine months of Baby Girl K.'s life, and relies solely on the nine months of pregnancy. This is an erroneous and unconstitutional application of sec. 48.415(6)(a)2, Stats. Clearly B.B.'s conduct during Baby Girl K.'s life is at least equally important to the determination of whether he established a parental relationship with his daughter as the gestation period.

Rather, the correct application of the statute is to examine B.B.'s conduct from the time he learned of the pregnancy to the time he was adjudicated (here by his own motion) Baby Girl K.'s father. A review of the entire record in this light leads to the conclusion that the trial court's finding that B.B. failed to establish a substantial parental relationship was "clearly erroneous." Sec. 805.17(2), Stats.

The review of the record before the court is somewhat complicated by the fact that there is evidence in the record as a whole relating to the issue of establishment of a "substantial parental relationship" which was not presented at the termination hearing nor considered by the

trial judge. I began with an examination of the evidence presented at the termination hearing. There was undisputed evidence that the father did not contribute to the expenses of the pregnancy that arose before he was incarcerated, although he had the funds to do so. It is also undisputed that on one occasion B.B. physically assaulted L.K. while she was pregnant. Finally, it is undisputed that on two occasions B.B., in disregard of L.K.'s welfare, asked L.K. to smuggle marijuana into the prison. All this evidence militates toward a finding that B.B. was not concerned for the welfare of either the mother or baby.

However, other testimony of the mother shows that B.B. did have a concern for both her and Baby Girl K., both *during* and *after* the pregnancy. The evidence demonstrates that B.B. was "happy" when he learned of the pregnancy, intended to marry the mother, and spent "every day" with the mother until his incarceration. Her testimony established that during the pregnancy he did pay her dental expenses and that following his incarceration she wrote to B.B. telling him not to worry about the expenses of her pregnancy. Finally, the evidence introduced at the hearing indicates that following his incarceration B.B. repeatedly informed L.K., through letters and telephone conversations, that he was willing to provide for both the mother and the child by the placement in his mother's home until he was released.[2]

---

[2] The majority chooses one sentence from one letter to demonstrate that B.B. in his letters to L.K. showed that his only interest in the child was to perpetuate his relationship with L.K. (*Supra*, p. 433, n. 4). The majority fails to point out that in this same letter, along with the other letters contained in the record, B.B. on a number of occasions speaks of his concern for the mother and the child, both during and after pregnancy and his intent to provide for both of them. The record also contains a letter to the trial court from the chaplain of Kettle Moraine Correctional Institute in which he expresses his opinion that B.B. was genuinely inter-

B.B. presented evidence that made his interest in the child known by filing a Declaration of Parental Interest.

If this was the extent of the evidence in the record relating to whether B.B. had shown parental interest, it would be a much closer question whether the trial court's finding should be upheld based on the trial judge's ability to view the witnesses and assess credibility. However, there is other information in the record of the trial court as presented to the court which bears directly on the issue of B.B.'s attempts to assume parental responsibility for Baby Girl K. under the terms of sec. 48.415 (6) (a) 2, Stats.

There are references in the record to the fact that since the child's birth B.B. wrote to the foster parents, the trial judge and the Department which had legal custody of Baby Girl K., requesting photographs and information on the child's placement and welfare, and expressing his intent to have the child placed with his mother's family until he was released and could care for the child himself. The record demonstrates that on one occasion the trial judge explicitly rejected B.B.'s attempts to communicate with his daughter, stating that such action was premature until paternity was established. Further, when the record is looked at as a whole, it is clear that consistently since the child's birth the father had attempted through the legal process to demonstrate his interest in and concern for the child and his intent to provide for the child.[3] In light of B.B.'s

---

ested in his daughter and was not motivated by an intent to retain a relationship with the mother.

[3] B.B.'s attempts through the legal process to assert his interest in Baby Girl K. are as follows: Less than one month after her birth, B.B. filed a Declaration of Parental Interest; at an initial hearing on the "Chip's" petition filed by L.K., B.B.'s counsel informed the court that B.B. wanted the child placed with his mother until his release; in August of 1981, B.B. filed a petition for determination of paternity and custody and a motion for summary

limited opportunity and ability to personally provide care and support for Baby Girl K. following his incarceration (five months into the pregnancy) and the fundamental nature of the right at issue, I find the information in the record of B.B.'s attempts through the legal process and correspondence to assert his interest in his child to be especially important.

This information was in the record before the trial court when it made its determination that parental rights should be terminated, but the record demonstrates that the trial court did not consider this evidence. Rather, the trial court, in its findings of fact, explicitly found that B.B. "failed to present evidence of any attempts on his part to establish a parental relationship with Baby Girl K. such as attempts to contact said child, write to persons caring for said child or to send the child cards or gifts." The entire record before this court simply does not support this finding. The majority perpetuates the trial court's error by also ignoring this very relevant and important evidence.

On the basis of the entire record before this court and the trial court, I believe that the trial court's finding that the statutory grounds for involuntary termination were met to be unsupported by the record. However, because of the nature of the evidence in the record, I would remand the action for a new hearing on this issue rather than simply finding that the statutory grounds were not met. Some of the evidence of B.B.'s attempts to contact the child consists of references to letters which are not in the record and their actual content is unknown. Further, some of the evidence that is actually

judgment on the issue of paternity; at an initial hearing on the paternity petition and L.K.'s petition to terminate B.B.'s parental right, B.B.'s counsel asked the court to allow B.B. to communicate with his daughter through the Department of Social Services, which had legal custody of Baby Girl K.

contained in the record may not have been properly before the trial court. Finally, I believe that the trial court is in a better position to assess the credibility of such evidence and witnesses. This is especially important in this case because L.K. and the guardian *ad litem* state that B.B.'s concern for the child is motivated solely by his desire to effect a reconciliation with the mother. B.B. denies any such motivation and there is some evidence in the record showing that his interest is genuine, *see* n. 2, *supra.* This court is simply not in a position to make an informed decision on this issue which involves a credibility determination. For these reasons I believe this issue should be retried under authority granted to this court by sec. 751.06, Stats.

The majority also holds that due process does not require a finding that B.B. is an unfit parent before his parental rights can be terminated. I disagree. The majority relies on the recent United States Supreme Court decision in *Lehr v. Robertson,* —— U.S. —— (June 27, 1983), to support this position. I believe their reliance on the *Lehr* decision is misplaced.

First, the court in *Lehr* was addressing the limited issue of whether the New York statutory scheme adequately protected the putative father's opportunity to form a parental relationship with his child, such that he would then be entitled to notice of adoption proceedings. *Lehr,* —— U.S. ——, slip. op., p. 14. The New York statutory scheme under review in *Lehr* has absolutely no similarity to sec. 48.415(6)(a)2, Stats., and thus *Lehr* at best has only very limited applicability to the instant case.

Second I read *Lehr* to fall into the holding of *Quilloin v. Walcott,* 434 U.S. 246 (1978) as interpreted by this court in *In Interest of J.L.W.,* 102 Wis. 2d 118, 306 N.W.2d 46 (1981). In *J.L.W.* the court held that "except under unusual circumstances like those presented

in *Quilloin,* the due process protections of the state and federal constitutions prohibit the termination of a natural parent's rights, unless a parent is unfit." 102 Wis. 2d at 136. The unusual circumstances in *Quilloin* which allowed the court to terminate parental rights without a finding of unfitness are as follows: an unwed father attempted to block the adoption of his son by the natural mother and her husband when the child was eleven years old and had been in the mother's custody his entire life. The father never had custody and was not seeking custody but wanted to block the adoption which would terminate his parental rights. The Court rejected the father's argument that he was denied due process, stating:

"We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–863 (1977) (STEWART, J., concurring in judgment). But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the 'best interests of the child.' " 434 U.S. at 255.

Similarly, in *Lehr,* the putative father "never had any significant custodial, personal or financial relationship (with his child), and he did not sek to establish a legal tie until after she was two years old." *Lehr,* ——— U.S. ———, slip op., p. 14. Also, as in *Quilloin,* the father was

attempting to block the adoption by the natural mother who had had custody since birth.

The facts in this case are clearly distinguishable from those in *Quilloin* and *Lehr*. This is not a situation as in *Quilloin* and *Lehr* where the natural parent displayed almost no interest in the child for its entire life although well aware of the fact of parenthood and able to provide and care for the child. Here B.B. has indicated interest and concern for the child since he learned of her conception and has since shortly after birth requested custody. Further, B.B. is not attempting to block the adoption of Baby Girl K. by the natural mother or into an established family unit as in *Quilloin* and *Lehr*. In this case the natural mother, three days after the birth, released custody of Baby Girl K. to the Marathon County Department of Social Services. Here there are no adoptive parents nor adoption proceedings pending. Nor could there be until B.B.'s parental rights are terminated. Thus we find that the narrow "unusual circumstances" exception recognized in *J.L.W.* does not apply and due process requires that B.B. be found unfit before his rights can be terminated. As discussed above, the record simply does not support the finding of the majority that B.B. failed to establish a substantial parental relationship. He is therefore entitled to a finding of unfitness before his parental rights can be terminated. *Stanley v. Illinois*, 405 U.S. 645 (1972).

Further, contrary to the holding of the court of appeals, this court can not find that B.B. is an unfit parent as a matter of law based on the record before this court. Initially, there is an insurmountable constitutional obstacle to the court making such a finding based on this record—the Due Process Clauses of the state and federal constitutions. It is beyond dispute that due process demands adequate notice and an opportunity to be heard when a person is threatened with termination of

a fundamental liberty interest. B.B. was never accorded this constitutionally mandated hearing and thus his parental rights can not be terminated by this court. The record clearly demonstrates that B.B. was never notified that the petitioner was attempting to prove he was an unfit parent. Further, the record shows that the issue was never litigated in the termination hearing, nor even considered by either the trial court or the petitioner. The issue before the trial court at this hearing, and all the evidence presented, was directed solely to the question of whether the statutory grounds for involuntary termination were met. Thus, on this basis alone, the majority's termination of B.B.'s parental rights unquestionably violates due process and should not be sustained.

Further, even without this constitutional impediment, the record is insufficient to support the court of appeals holding that as a matter of law B.B. is an unfit parent. The evidence required to support a finding of parental unfitness must be very substantial:

"The standards for a finding of unfitness in Wisconsin have long deferred, as much as possible, to parental rights. When unfitness *is* found, however, it must be based upon most substantial grounds. The standards for unfitness have long been stringent. To support a finding of unfitness,

" 'it must appear that the [parent] has "so conducted himself, or shown himself to be a person of such description, or is placed in such a position, as to render it not merely better for the children, *but essential to their safety or to their welfare,* in some very serious and important respect, that his rights should be treated as lost or suspended,—should be superseded or interfered with." [Emphasis added.]'

*Lemmin v. Lorfeld,* 107 Wis. 264, 266, 83 N.W. 359, 360 (1900). It is evident, then, that a finding of unfitness is a determination that further contact between parent and child will be seriously detrimental to the

child." *Termination of Parental Right to A.M.K.,* 105 Wis. 2d 91, 102, 312 N.W.2d 840 (Ct. App. 1981).

The record simply does not support a finding that as a matter of law it is essential for Baby Girl K.'s safety or welfare that B.B.'s parental rights be terminated.

The court of appeals, in holding that a finding of unfitness was "clearly sustained by the record," stated:

"The trial court found that prior to his incarceration, B.B. had funds available to provide care and support for L.K. but failed to do so. The court also considered the incident of physical violence by B.B. toward the mother during her pregnancy and the fact that he requested that she smuggle marijuana into the prison for him twice during her pregnancy. At the very least, B.B.'s conduct demonstrates a complete indifference to the welfare of the child. The court also found that although B.B. was interested in the child, he failed to carry through with actions that would establish a substantial parental relationship."

The court of appeal's reference to the failure of B.B. to support L.K. and establish a substantial parental relationship can not be considered by this court in determining unfitness because the trial court's finding that that statutory grounds were met was not supported by the record. Further, I conclude that evidence of one isolated physical assault on the mother and two requests for marijuana while in prison do not as a matter of law make B.B. an unfit parent by clear and convincing evidence.

The only other evidence in the record that goes to unfitness is the fact that B.B. is now incarcerated for a burglary conviction, has a criminal record, and according to L.K.'s testimony, B.B. "dealt in drugs" and "robbed places." While all this evidence clearly is relevant to the issue of fitness, there are no facts in the record detailing any of this evidence. All the record contains is the bare facts stated above. Without an examination into

the details of B.B.'s actions, a finding of unfitness is not supportable.

This court cannot, based on this inadequate record, make the far-reaching finding of unfitness which leads to the irrevocable termination of parental rights. As stated by this court in *Termination of Parental Rights to T.R.M.*, 100 Wis. 2d at 689: "An examination of a record seldom is adequate to make the necessary factual determinations that are a part of this type of controversy." I would also remand the action to the trial court to conduct a hearing on B.B.'s fitness as a parent.

I therefore dissent.

I am authorized to state that JUSTICES HEFFERNAN and ABRAHAMSON join in this dissent.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. I join Chief Justice Beilfuss's dissenting opinion.[1] I write separately to add that I disagree with the majority's conclusion that sec. 48.415(6)(a)2, Stats. 1981–82, does not violate the equal protection clauses of the Wisconsin and the United States constitutions.

Everyone agrees that sec. 48.415(6)(a)2 treats unmarried parents differently according to their gender. Sec. 48.415(6)(a)2 establishes grounds for terminating the unwed father's parental rights, not the mother's. I conclude that the statute on its face and as applied

---

[1] I only add that the majority treats termination of parental rights like a punishment for a crime, thus increasing the legislatively prescribed penalties for commission of a crime by adding a new penalty, loss of a child. Slip op., pp. 13, 19. The purpose of termination should be to place children permanently in accordance with their best interests, not to punish a parent. I would hold that the penalty of termination of parental rights for the commission of a crime is *per se* cruel and unusual punishment in violation of the United States Constitution, amends. VIII, XIV and the Wisconsin Constitution, art I, sec. 6.

to the facts in this case unconstitutionally discriminates against men based on their gender.[2]

Both this court and the United States Supreme Court are struggling with the difficult issue of defining the constitutional rights of parents and children. Judges and lawyers, like the general public, are parents and are not insulated from the highly personal and sometimes emotionally charged nature of the issues presented in these cases.[3] In this case we are specifically concerned about the due process and equal protection rights of unwed parents. The Supreme Court first indicated its recognition that unwed fathers have constitutional rights just eleven years ago in *Stanley v. Illinois*, 405 U.S. 645 (1972). *Stanley* raised more questions than it answered, leaving at least four major legal issues unresolved: whether the constitutional rights of unwed fathers are based on concepts of procedural or substantive due process or both; whether all unwed fathers have constitutional rights or whether only unwed fathers who have expressed an undefined amount of interest in the child are to be accorded constitutional protection; whether

[2] Under this reasoning it is not necessary to reach any of the other issues presented in this case. A court can terminate parental rights involuntarily if one of the grounds for termination under sec. 48.415 is proved in a fact-finding hearing. Sec. 48.42(1)(c)2, Stats. 1981–82. *See also In the Interest of DLS*, 112 Wis. 2d 180, 186, 332 N.W.2d 293 (1983). Only after the court finds that a statutory ground for termination of parental rights exists does the court reach the question of whether the parent whose rights are to be terminated is unfit. In this case the statutory ground set forth in the petition and argued at trial was the father's failure to assume parental responsibility. Sec. 48.415(6)(a)2. If the statutory ground is void because it violates the constitutions of this state and of the United States, the trial court could not involuntarily terminate the father's parental rights in this case, regardless of whether he was unfit as a parent. See pp. 447, 448.

[3] I find some of the majority's sociological observations questionable, but because they are only tangentially relevant to the legal issues presented in this case I do not discuss them.

the constitutional rights of unwed fathers are different depending on the type of proceedings, for example, adoption and termination of parental rights as opposed to custody; and whether equal protection concerns are addressed to distinctions between married and unmarried parents or between male and female parents.

Since *Stanley,* the Supreme Court has had few occasions to examine the extent to which a natural father's biological relationship with his illegitimate child is accorded constitutional protection. *See Quilloin v. Walcott,* 434 U.S. 246 (1978), *Caban v. Mohammed,* 441 U.S. 380 (1979), and, decided just four days ago, *Lehr v. Robertson,* —— U.S. —— (June 27, 1983).[4] Both *Quilloin* and *Lehr* appear to address the due-process issue as applied to a particular case; *Caban* addressed the gender discrimination issue.

State legislatures, too, have wrestled with the problem of striking a balance between according rights to parents and ensuring that terminations are handled quickly and efficiently so that adoptions can proceed. *See* secs. 48.40 *et seq.,* Stats. 1981–82. Recognizing these areas of law as troublesome and ill-defined, I turn to a consideration of one aspect of the statute's constitutionality.

Sec. 48.415(6)(a)2 provides that one of the grounds for termination of a father's parental rights shall be

---

[4] I question the majority's haste to conclude that *Lehr v. Robertson* makes superfluous any due process protections accorded by this state's statutes or constitution. The Supreme Court decided *Lehr v. Robertson* four days ago. This court has had only parts of two days to reflect on that case and the differences between the New York statutes involved in *Lehr* and the Wisconsin statutes. I would have preferred to give the parties and the state an opportunity to submit briefs on the possible impact of *Lehr* on the issues presented in this case to enable this court to give *Lehr* the considered reflection it deserves. Because the majority considers *Lehr,* I, too, reluctantly consider it.

the father's failure to assume parental responsibility. According to the statute, failure to assume parental responsibility may be established by showing the following:

(1) the child was born out of wedlock and is not legitimated or adopted (48.415(6)(a));

(2) paternity was not adjudicated prior to the petition for termination of parental rights (48.415(6)(a));

(3) the *father* did not establish a substantial parental relationship with the child prior to the adjudication of paternity although the father had reason to believe that he was the father of the child and had an opportunity to establish a substantial parental relationship with the child (48.415(6)(a)2).

Sec. 48.415(6)(b) defines the phrase "substantial parental relationship" as meaning the acceptance and exercise of significant responsibility for the daily supervision, education, protection, and care of the child. It sets forth the following factors which the court may consider in evaluating whether a substantial parental relationship is established: "whether the person has ever expressed concern for or interest in the support, care or well-being of the child or the mother during her pregnancy and whether the person has neglected or refused to provide care or support even though the person had the opportunity and ability to do so."

The issue is whether this gender-based distinction, allowing the termination of a father's, but not a mother's, parental rights based on failure to assume parental responsibility violates the equal protection guarantees of the federal or state constitution.

A gender-based distinction can satisfy the equal protection guarantees of the United States Constitution if the statute "at least . . . serves 'important governmental objectives and [is] . . . substantially related to

achievement of those objectives.' "⁵ The party seeking to uphold the statute carries "the burden of showing an 'exceedingly persuasive justification' for the classification."⁶ The constitutionality of any gender-based distinction must be examined "free of fixed notions concerning the roles and abilities of males and females," and free of "archaic and stereotypic notions" about the roles of men and women. *Mississippi University for Women v. Hogan,* —— U.S. ——, 50 L.W. 5068, 5070 (1982).

This test for determining whether a gender-based distinction is constitutional has been termed the "intermediate level" scrutiny test. I, of course, accept this test for federal constitutional purposes, but for Wisconsin state constitutional purposes, I continue to adhere to the view that because gender-based classifications are inherently suspect, the "strict scrutiny" test is more appropriate. *Marshfield Clinic v. Discher,* 105 Wis. 2d 506, note 8 at 524, 314 N.W.2d 326 (1982) (Abrahamson, J., dissenting). I continue to believe that any classification based on immutable personal characteristics is "suspect" and that gender is obviously an immutable personal characteristic. Gender is a "visible characteristic determined by causes not within the control of the individual. It bears no relation to ability to contribute to or participate in society." *Hewitt v. Saif,* 294 Or. 33, 653 P.2d 970, 977 (1982). I do not believe it is necessary to analyze this statute according to a strict scrutiny

⁵ *Mississippi University for Women v. Hogan,* —— U.S. ——, 50 L.W. 5068, 5070 (1982), quoting from *Wengler v. Druggists Mutual Insurance Co.,* 446 U.S. 142, 150 (1980). *See also Lehr v. Robertson,* —— U.S. —— slip op., pp. 17–18 (June 27, 1983); *Craig v. Boren,* 429 U.S. 190, 197 (1976); *Caban v. Mohammed,* 441 U.S. 380, 388 (1979).

⁶ *Mississippi University for Women v. Hogan,* —— U.S. ——, 50 L.W. 5068, 5070 (1982), quoting *Kirchberg v. Feenstra,* 450 U.S. 455, 461 (1981); *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 273 (1979).

standard, however, because this statute can not withstand the lesser intermediate level of scrutiny.

I conclude that the statute on its face and as applied is unconstitutional under the state and federal constitutions because the means used to achieve the government's objectives are not "substantially related to the achievement of those objectives." I first consider whether the statute on its face is unconstitutional.

The statute is designed to achieve the important governmental objectives of promoting the best interests of the child, protecting the rights of interested third parties, and ensuring promptness in and finality of the termination of parental rights to facilitate the child's adoption. I agree that these objectives are legitimate and important. *Lehr v. Robertson*, —— U.S. ——, slip op., p. 18 (June 27, 1983) ; *In the Interest of DLS,* 112 Wis. 2d 180, 187, 332 N.W.2d 293 (1983). Like its interest in voluntary termination proceedings, the state also has an interest in involuntary termination proceedings to ensure that the termination of parental rights is just. *In the Interest of DLS,* 112 Wis. 2d 180, 185, 332 N.W.2d 293 (1983).

The statute can only be upheld, though, if the gender-based distinction in sec. 48.415(6)(a)2 "is structured reasonably to further these ends," *Caban v. Mohammed,* 441 U.S. 380, 391 (1979).

While I agree with the majority that the failure of a parent to develop a substantial parental relationship with the child is a proper ground for the involuntary termination of parental rights, *see Lehr v. Robertson,* —— U.S. ——, slip op., p. 12, that truth is not sufficient to enable the statute to withstand constitutional attack. The state must still answer the question of why the statutory criterion applies to male parents but not to female parents.

There appear to be three justifications for this gender-based distinction. First, it may be argued that the dis-

tinction is justified because one automatically knows the identity of the mother, but the father is neither known nor accessible. In this case, and in all cases in which sec. 48.415 (6) (a) 2 applies, that basis for distinguishing between an unwed mother and an unwed father is irrelevant because the substantial parental relationship criterion is applicable only after the putative father has been notified of the termination proceedings, has appeared, and his paternity has been adjudicated. The legislature has already provided a means to terminate the parental rights of a father who cannot be identified or found. Sec. 48.415 (6) (a) 1.

The second possible justification for the gender-based distinction concerns the differences between the parents during the child's gestation period. The majority justifies the gender-based statute on the basis of the biological distinction between men and women concerning a child's gestation, just as it relies primarily on the father's actions during pregnancy to affirm the trial court's findings that the evidence fulfilled the statutory termination grounds (see Beilfuss, C.J., dissenting, *supra*, p. 453). Because women can become pregnant and physically can carry children within their bodies, but men cannot, reasons the majority, the gender-based distinction is justified.

I do not dispute the fact that there are biological differences between men and women. But I do not agree that these biological differences are sufficient justifications for this gender-based statute. The United States Supreme Court has recently strenuously emphasized that a parent's "mere biological relationship" with a child is not accorded constitutional protection. *Lehr v. Robertson*, —— U.S. ——, slip op., pp. 11–12 (June 27, 1983). *"Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." Id.*, at ——, slip op., p. 11, quoting with approval from *Caban v. Mohammed, supra*, 441 U.S. at 397 (Stewart, J., dissenting), quoted

with approval in the majority opinion, supra, pp. 445, 446. In *Lehr,* the Court distinguished between "a mere biological relationship and an actual relationship of parental responsibility" created by the parent's role in the child's life. *Lehr* at ——, slip op., p. 12, and p. 13, n. 17. The Court in *Lehr* considered only the role of a biological father, because only that issue was before it, but the same reasoning applies to a biological mother. This reasoning undermines the very premise of the majority's holding that the mere biological differences between the father and mother, that is, insemination versus pregnancy, justify a gender-based distinction as to grounds for termination of parental rights.

Even if the biological difference between man and woman can be considered as the basis for establishing different grounds for termination of the father's and mother's parental rights, the reasons based on biological differences pointed out by the majority as support for the *gender-based distinction do not withstand* scrutiny. According to the majority, a man, unlike a woman, has the choice whether to care for the unborn child by caring for the pregnant woman and should forfeit parental rights to the child if he does not fulfill his parental responsibility to the unborn child by taking care of the mother. The majority asserts that, as a matter of nature, "biology dictates that [the mother] provide care and support for a child during pregnancy [by taking care of herself]." *Supra,* p. 450. The mother, as the carrier of the child, cannot, says the majority, choose not to accept and exercise significant responsibility for the care and protection of the child during pregnancy. The majority asserts that the woman's only option other than to exercise responsibility is to abort the pregnancy. *Supra,* p 442. The majority is, I suggest, mistaken about a woman's role during pregnancy.

Biology dictates only that a woman carry a child. It does not dictate that she show responsibility by provid-

ing proper care for herself (and thus the unborn child) or even that she love the child. The mother has control over prenatal care which, as the majority recognizes, is "important to the eventual health and well-being of an infant." *Supra,* p. 439 and n. 6. A woman can disregard the care and protection of the child during pregnancy by ignoring the importance of proper nutrition, medical care, and exercise, by smoking or ingesting dangerous drugs, by overuse of caffeine and alcohol, by gaining too much or too little weight, by exposing herself to hazardous environmental elements, or by subjecting herself to stress. A woman's support and care of an unborn child are voluntary and important.[7]

The mother, who fails to take care of herself, as well as the father, who fails to take care of the pregnant woman, fails to fulfill parental responsibilities to the unborn child. If the failure to fulfill parental responsibilities to the unborn child is a ground for terminating the father's rights, the majority gives no reason why it should not be a ground for terminating the mother's rights. Since the mother's role during pregnancy is generally more important than the father's, according to the majority's reasoning, it would appear that there is even more justification to terminate the mother's parental rights for failing to assume responsibility to the unborn child than the father's.

The third possible justification to gender-based distinction concerns the differences between the parents after the birth of the child. Although the statute requires the court to look at the relationship of the unwed father to the child after the child's birth, the majority confines its

---

[7] *See* Castello, *Getting Ready for Parenthood: A Manual for Expectant Mothers and Fathers,* pp. 45–50 (1957); Hess and Hunt, *Pickles and Ice Cream, The Complete Guide to Nutrition During Pregnancy* (1982) *passim;* NIOSH, *Guidelines on Pregnancy and Work* (1977) *passim;* Russell, *Eastman's Expectant Motherhood* 48–87 (6th ed., 1977); Verrilli and Mueser, *While Waiting: A Prenatal Guidebook,* 25–46 (1982).

reasoning justifying the gender-based distinction to the gestation period or at most immediately following gestation, *supra,* p. 449, because even it appears to recognize that the biological differences between unwed fathers and mothers cannot justify different treatment as to their voluntary failure to assume responsibility for the child after the child's birth.

Recognizing this fact, the majority, relying on Justice Stevens's dissenting opinion in *Caban v. Mohammed,* 441 U.S. 380, 389 (1979), concludes that the differences between unwed mothers as a class and unwed fathers might form a basis for a valid gender-based distinction regarding adoption proceedings where newborn infants are concerned. (*Supra,* p. 449.) The *Caban* majority did not decide this issue, and the Court specifically concluded that even assuming a difference between the closeness of unwed mothers and unwed fathers to the child based on their relationship to the child during pregnancy and immediately afterward, this generalized difference would not constitutionally support a gender-based distinction for purposes of adoption, and it "would become less acceptable as a basis for legislative distinctions as the age of the child increased." *Caban v. Mohammed, supra,* 441 U.S. at 388–89. *Caban*'s analysis of equal protection and gender-based adoption laws was not overruled in or modified by *Lehr.* Here the child is nine months old, and the majority's reasoning is inadequate.

Because none of the proposed justifications for the statute can withstand analysis, I conclude that the statute's gender-based distinctions are not substantially related to the governmental objectives and that the statute is unconstitutional on its face.

Even if this statute were held constitutional on its face, it is clearly unconstitutional as applied in this case. As Justice Stevens explained in *Lehr v. Robertson,* —— U.S. ——, slip op., at p. 19 (June 27, 1983), a statute granting different rights to a mother and father regard-

ing termination of their parental rights may not constitutionally be applied in those cases where the mother and father are *in fact* similarly situated with regard to their relationship with the child. The majority has generalized that the mother is naturally closer to her child and has the natural obligation to raise the child. In this case, though, the mother's relation to the child during pregnancy was not explored, but we do know that the mother voluntarily decided not to raise the child, placing the child outside her home within three days after its birth, for reasons that may very well stem from her love for the child and her desire to allow it to be adopted. The trial court found as a fact that the "child had no relationship with *either* parent. . . ." (emphasis added; *supra,* p. 437). Accepting this finding of the circuit court, I must conclude that the mother and father in this case are similarly situated as to the child. Nonetheless, the statute treats the two parents differently, for no apparent reason. If this mother refused to terminate her parental rights voluntarily, involuntary termination proceedings could not be instituted against her on the ground that she failed to establish a substantial parental relationship with the child because the statute does not apply to the unwed mother. When one takes into consideration the father's actual efforts to establish a relationship with the child by initiating paternity proceedings one month after the child's birth and his expressing constant interest in the child, it is ironic that he, but not the mother, can have parental rights involuntarily terminated on this ground and without a finding of unfitness. According to *Lehr,* this statute is unconstitutional as applied in this case.

I conclude that the statute systematically harms men by assuming that even those unwed fathers who come forth after a child's birth, assert and adjudicate their paternity, and make reasonable efforts under the circumstances of the case to maintain parental ties with their children are to be treated differently from the bio-

logical mother regardless of her parental relationship with this child. This type of systematic harm to men can only "be explained . . . as the product of habit, rather than analysis or reflection," and cannot withstand constitutional scrutiny. *Lehr v. Robertson,* —— U.S. —— (slip op., p. 17, n. 24, June 27, 1983). Sec. 48.415(6)(a)2 subjects men and women to disparate treatment when there is no substantial relation between the disparity and an important state purpose. *Lehr v. Robertson,* —— U.S. —— (slip op., pp. 17–18, June 27, 1983). Accordingly, I would hold that this statute violates the equal protection clauses of the United States and the Wisconsin Constitutions. I dissent.

I am authorized to state that JUSTICE NATHAN S. HEFFERNAN joins in this dissent.